No. 47,204

DARLENE HIATT, *Appellee,* v. PATRICIA J. GROCE and BETHANY HOSPITAL, INC., *Appellants.*

(523 P. 2d 320)

Opinion filed June 15, 1974.

*Leonard O. Thomas,* of Weeks, Thomas, Lysaught, Bingham & Johnston, Chartered, of Kansas City, argued the cause, and *David K. Fromme,* of the same firm, was with him on the brief for the appellants.

*Felix G. Kancel, Jr.,* of Kansas City, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Schroeder, J.: This is a negligence action brought against the defendant, Patricia J. Groce, while acting as a nurse within the scope of her employment with the defendant, Bethany Hospital, Inc., for injuries resulting to the plaintiff while a maternity patient at the hospital for failure of Patricia J. Groce to notify the plaintiff's physician that delivery of plaintiff's child was imminent. A jury returned a verdict for the plaintiff and assessed the damages at $15,000 upon which the trial court entered judgment. Appeal has been duly perfected by the defendants.

The primary questions on appeal concern the sufficiency of the evidence to sustain the plaintiff's allegations of negligence and causation.

On the evening of January 23, 1970, Darlene Hiatt (plaintiff-appellee), 24 years of age, entered Bethany Hospital, Inc. (defendant-appellant) for the birth of her second child. She entered the hospital at about 7:00 p. m. on that date, after having notified her physician, Dr. Lee Rook, of her intention. Upon arrival at the hospital, Dr. Rook was notified by the hospital of her admission, and Mrs. Hiatt was taken to the labor room where she was prepared for delivery. The evening was uneventful and at 11:00 o'clock p. m. on the 23rd day of January, 1970, Mrs. Hiatt went to bed experiencing only mild labor pains. Between 7:30 and 8:00 a. m. on the 24th day of January, Patricia J. Groce (defendant-appellant) came on duty at the hospital as a nurse. According to Mr. Hiatt the nurse told him to watch the clock and time the length and interval of pains, and that as the pains became closer together the husband was instructed to notify the nurse. During that time Nurse Groce was in an office up the hallway from the labor room reading a magazine, according to Mr. Hiatt.

Mr. Hiatt testified that about 7:30 that morning he found the nurse and informed her that his wife's pains were getting harder and closer together and asked her to check his wife. His testimony was that Nurse Groce continued to read the magazine and then said, "All right, I will go check her." After checking her, the nurse

said, "She's piddling around. It will be quite some time before she has the baby." The nurse informed him that his wife was still at seven, meaning she was at seven centimeters of dilation. He then informed the nurse at the birth of their first child, birth came immediately after his wife had reached eight centimeters of dilation; to which the nurse responded that he should not worry about it, that she was in charge on the floor and would take care of calling the doctor and do what was necessary when she thought it was necessary.

At 8:30 o'clock that morning the pains were getting very hard and close together. The husband went to see Nurse Groce again and asked her to check his wife; but she continued to read the magazine and said that she would be there in a minute. When the nurse came from the labor room she informed Mr. Hiatt that his wife was at "eight." Testimony of the husband was that he would appreciate her calling the doctor immediately, and he repeated that on the birth of their first child the baby was born shortly after "eight."

Mrs. Sledd, the mother of Darlene Hiatt, was present at the hospital on the night in question. She had given birth to sixteen children. Mrs. Sledd was in the labor room watching her daughter rather closely and at 8:30 o'clock in the morning asked Nurse Groce whether she had called the doctor and the nurse answered in the affirmative. At that time Mrs. Sledd said, "I know childbirth and I knew she should have been in the delivery room." She testified the baby was on the right side and there was a big knot; that her daughter was "in real birth pain, looked like the baby was coming, which I knew it was." She testified the labor pains were "about every two minutes, every minute." She said, "You know, the pain was there and—you know, it wouldn't leave like it usually would. It was just there." Mrs. Sledd testified that she didn't know anything about her daughters measurements but said, "Well, I just—you know, she was like, you know, when a child is going to be born. I was watching her because I was concerned why they didn't give her something."

The next time Mr. Hiatt went to ask Nurse Groce to examine his wife was at 9:00 o'clock a. m. Again, he testified, Nurse Groce continued to read a magazine and stated she would "be there in a minute." When she did examine Mrs. Hiatt the nurse told Mr. Hiatt that dilation was at eight centimeters. Mr. Hiatt then asked the

nurse to call the doctor and repeated what he had previously told her concerning the prior birth. Nurse Groce replied that she was in charge and would do what she considered necessary. Mr. Hiatt then told Nurse Groce he would hold her responsible if anything happened to his wife. Nurse Groce retorted: "This hospital has never lost a father yet so you just go back there and sit down." After making this statement Mr. Hiatt testified that Nurse Groce returned to the nurses' office and began again to read a magazine.

Some ten minutes later Mrs. Hiatt screamed and grabbed her husband and said, "I am going to have that baby right now." Hurriedly, the husband went to get the nurse. The nurse continued to read the magazine for awhile and then went to the labor room; immediately left the labor room and went to the telephone to call Dr. Rook, telling him, "we are having a baby right now" and ran back to the labor room. The nurse then pushed Mrs. Hiatt into the delivery room on a cart and Mrs. Hiatt was told to get off the cart and get on the delivery table, which she did by herself. Mr. Hiatt testified the nurse rushed back into the hall to try to find a doctor, and told Mrs. Hiatt, "Pant like a dog and don't have that kid yet." Mr. Hiatt said that when he returned to the delivery room his wife was on the table with her feet up in stirrups, Nurse Groce went into the hall and got a Dr. Sullivan, who was walking by, and said, "Dr. Sullivan * * * come in here quick * * * We are having a baby right now." The evidence reveals that Dr. Sullivan was not scrubbed; that Nurse Groce was scrubbed and wearing gloves and that Nurse Groce delivered the baby. Nurse Groce testified that although the hospital records state the baby was delivered by Dr. Sullivan for Dr. Rook, she in fact had delivered the baby but was under orders from the hospital not to record that fact.

Mrs. Hiatt testified that when she had climbed from the cart to the delivery table by her own effort, and had placed her own feet in the stirrups at the end of the table, she looked in the mirror, which was in the delivery room, and saw that the baby was being born. She saw the baby's head and shoulders making exit from her body at the time Nurse Groce came in with Dr. Sullivan. Mrs. Hiatt testified that when she observed this condition she fainted and that when she regained consciousness Dr. Sullivan was sewing her up; that she asked Dr. Sullivan not to do that because she had had no anesthetic and that it was hurting her; but that he kept on sewing; and then Dr. Rook arrived and came into the room and said, "Why hasn't she been given any gas?"; at which time Dr. Rook turned

on the gas. Dr. Rook then completed the sutures on her vagina and labia. The evidence is that this unattended birth caused two lacerations of Mrs. Hiatt's vagina and labia. One laceration was on the left side and stitches were in place from the bottom clear to the top and around the top. There also was a laceration on the inside of the vagina which had not been sutured. This laceration was about an inch long. Mr. Hiatt testified that he counted eighteen stitches in the long sutured laceration, whereas Mrs. Hiatt testified that by the use of a compact mirror she counted fifteen stitches. The most Dr. Rook would admit in his testimony was that he "put a few sutures" in the lateration of the perineum.

The evidence discloses that following the birth and the suturing Mrs. Hiatt suffered extreme discomfort and pain for a long period of time. After recovery from the ordeal Mrs. Hiatt's marital relations with her husband were affected. Both Mrs. Hiatt and her husband testified that sexual activity between them was dramatically reduced and that she experienced no sensation or reaction in her vagina and labia.

The case was tried to a jury which returned a verdict in favor of Mrs. Hiatt assessing the damages at $15,000, the full amount requested in her petition. Both the nurse and the hospital appeal raising the points hereafter discussed.

The primary position taken on appeal by the appellants is that the evidence upon which the jury based its verdict was incompetent because it was principally the evidence of lay witnesses.

The first point asserted by the appellants is that the evidence was insufficient to support a finding of negligence or malpractice on the part of the defendant nurse.

The case was submitted to the jury solely upon the issue of negligence of the defendant nurse. The hospital was to be held liable under the doctrine of respondeat superior only if the nurse was found to have been at fault. The jury was so instructed.

A private hospital is bound to exercise toward a patient such reasonable care as the patient's known condition may require, the degree of care being in proportion to the patient's known physical and mental ailments. The extent and character of the care that a hospital owes its patients depends upon the circumstances of the particular case, and the measure of duty of a hospital is to exercise that degree of care, skill an diligence used by hospitals generally in the community and required by the express or implied contract of the undertaking. (*Goheen v. Graber*, 181 Kan. 107, 309

P. 2d 636 and *Karrigan v. Nazareth Convent & Academy, Inc.,* 212 Kan. 44, 510 P. 2d 190.)

The foregoing rule was correctly paraphrased by the trial court in this case by Instruction No. 8, which reads:

"It is the duty of a nurse of a hospital to a patient to exercise such reasonable care as her condition may require. The degree of care depends upon the known physical and mental ailments of the patient. In matters of medical or scientific nature, the standard of reasonable care of a nurse of a hospital is that degree of care, skill and diligence used by a nurse of a hospital, generally, in the community or in similar communities under like circumstances."

Expert medical testimony is ordinarily required to establish negligence on the part of either a physician or a hospital in their care and treatment of a patient, unless the medical procedures employed are so patently bad that negligence or lack of skill is manifest to a lay observer or other acts complained of could be regarded as negligent by applying the common knowledge and experience of mankind. (*Karrigan v. Nazareth Convent & Academy, Inc., supra.*)

In this action Mrs. Hiatt relied upon the alleged failure or refusal of Nurse Groce "to call plaintiff's physician when birth was imminent and the defendant Groce had been notified thereof", resulting in the absence of medical care and treatment by plaintiff's personal physician in the delivery room when plaintiff's baby was born.

Dr. Rook testified that on the 24th day of January, 1970, he received calls from the hospital regarding Mrs. Hiatt at 4:00 a. m., 7:30 a. m., and 9:15 a. m. He left immediately following the third call and said he ordinarily could arrive at the hospital within seven to ten minutes, "depending on traffic."

Nurse Groce testified:

"Q. What kind of a birth were you dealing with here?
"A. The last few centimeters, from the time she was eight—well, from the time she was complete went fairly rapidly. I think the doctor, if he only takes eight to ten minutes to get to the hospital, should have had time to get there when I called him.
"Q. If he had been at home, is that what you mean?
"A. If he had been at home."

When Nurse Groce made the 9:15 a. m. phone call to Dr. Rook's home, she was informed by his wife that he had gone to a hospital to deliver a baby, though she did not say which hospital.

The hospital records show that Mrs. Hiatt was given an anesthetic,

but there is no indication when it was administered. The hospital labor records show that Mrs. Hiatt reached eight centimeters and the baby began moving at 9:15 a. m., at which time Dr. Rook was called. Five minutes later at 9:20, plaintiff had dilated to ten centimeters and was transported to the delivery room and "scrubbed and draped". The delivery was completed at 9:34 a. m. There was testimony that delivery cannot occur until the mother reaches ten centimeters of dilation.

Dr. Rook testified that the point at which a nurse should "notify the physician that birth is imminent" could not be stated generally, but depended upon a number of factors which varied with each individual case. One factor was the measurement of dilation, "taking into consideration the speed at which dilatation is taking place." Also, the more severe the uterine contractions are, "usually the more rapidly dilatation takes place." He said he did not expect to go to the hospital as soon as the obstetrical patient arrived, although he recognized that occasionally these patients precipitate very suddenly. He delivered Mrs. Hiatt's first child and was familiar with her condition. He expected the nurse to take into consideration the various factors and to exercise her independent judgment about notifying the doctor of the patient's condition from time to time. The question as to whether he should be notified doesn't "depend upon the demands that have been made by relatives" but rather upon "the chart, the other things . . . mentioned". Dr. Rook found nothing wrong with the conduct of Nurse Groce, and he had made no complaint about it.

Rosemary Kilker, a teacher of maternity and obstetric nursing at the University of Kansas Medical School, department of nursing education, testified for the appellant. She testified that based on her study of the hospital records, Nurse Groce followed the standard of care that would be expected of professional nurses in the community. She would expect the nurse to call the doctor and report plaintiff's condition and progress at the time such calls by Nurse Groce were recorded. She stated the nurse must use her professional judgment as to when to call the doctor, taking into consideration the contractions, dilation, station and sometimes position of the baby.

Dr. Charles Stubblefield, a specialist in obstetrics gynecology, also testified for the appellants. He testified that based on the hospital records of this birth, Nurse Groce fulfilled the standard of care expected of her as a registered nurse in this community. His

testimony was that she kept Dr. Rook pretty well posted through the course of the labor and called him at "certainly the appropriate intervals." He stated that the nurse was expected to communicate the patient's condition to the doctor but, "at that point it's his decision to decide whether to come or sit for awhile."

The jury was instructed, without objection, as to the standard of care required of a registered nurse as follows:

"No. 11

"In determining whether a registered nurse used the learning, skill and conduct required of her, you are not permitted to arbitrarily set a standard of your own or determine this question from your personal knowledge. On questions of nursing expertise concerning the standard of care of a nurse, only those qualified as experts are permitted to testify. The standard of care is established by members of the same profession in the same or similar communities under like circumstances."

The establishment of the standard by expert witnesses in this case did not, however, resolve the question as to whether Nurse Groce complied with the standard.

Non-expert witnesses can testify as to external appearances and manifest conditions observable by anyone. (*Sly v. Powell*, 87 Kan. 142, 123 Pac. 881.)

Mr. Hiatt testified that about 9:00 o'clock his wife's pains were getting very hard to the point that they seemed unbearable and they were very close together. It required no degree of medical expertise for Mr. Hiatt to observe the degree of pain his wife was enduring and the frequency of her contractions. After Nurse Groce examined the plaintiff at the witness's request, she declined to call the doctor. Within fifteen minutes the plaintiff screamed that she was going to have the baby right away.

There also is the testimony of Erma Sledd, the plaintiff's mother. The witness was with the plaintiff on the morning in question. She observed her daughter about 8:30 and concluded she should have been in the delivery room. The plaintiff was having "real birth pain"; the contractions were about every minute and the pain "wouldn't leave like it usually would. It was just there"; and there was a big knot on plaintiff's right side. The jury was no doubt impressed by the fact that this witness had borne sixteen children. This testimony as to the plaintiff's observable condition was relevant for the jury's consideration in determining the nature of the conduct of Nurse Groce.

In *Yard v. Gibbons*, 95 Kan. 802, 149 Pac. 422, the plaintiff sued

an osteopathic physician for his alleged failure to properly treat her during and after the time she gave childbirth. The court said the following with regard to the testimony of the plaintiff's mother:

"It is contended that the mother of the plaintiff was erroneously permitted to give testimony of an expert character. Most of her testimony related to what was said and done by the defendant while attending the plaintiff, and about which any one cognizant of the facts might testify. She did state that early in the evening, a considerable time before the child was born, she made an examination of her daughter and was able to feel the head of the child, and stated that 'It was not down much.' This was as close as she came to giving testimony of an expert character, and it is easy to see that, however it may be viewed, it could not have been prejudicial error. Ordinarily only physicians and surgeons of special skill and experience are competent to testify whether a surgical operation has been performed or a patient treated with a reasonable degree of skill and care, but testimony as to many things connected with a case of this kind, such as the acts and statements of the physician or surgeon as well as the external appearances and manifest conditions observable by any one, may be given by non-expert witnesses. (*Sly v. Powell,* 87 Kan. 142, 123 Pac. 881.) Aside from that, the witness herself was the mother of five children. She had experience with other women in childbirth, and had been occasionally called to take care of them and nurse them. With this much experience there were certainly many things connected with mid-wifery about which she was qualified to testify." (p. 808.)

We believe on the basis of this record the jury had sufficient evidence before it to find Nurse Groce negligent in failing to notify the plaintiff's physician that birth was imminent. The expert testimony establishes the standard of care to be expected from an obstetric nurse in determining the imminence of childbirth. Various factors to be considered in determining the imminence of childbirth are: dilation; the progress of dilation; station of the child; the frequency and intensity of the contractions. While Drs. Rook and Stubblefield and Ms. Kilker were unable to conclude there was any dereliction of duty on the part of the defendant in the management of this case, the validity of *their conclusions was predicated solely upon the correctness of the hospital records* which were admitted into evidence. Unquestionably the hospital records were admissible under K. S. A. 60-460 (*m*) as business records. (See, *In re Estate of Bernatzki,* 204 Kan. 131, 460 P. 2d 527.) However, the records are still subject to the jury's scrutiny in light of all the evidence. The evidence in this case showed that Nurse Groce performed the delivery of the baby, and that she had been instructed by her supervisor to never state in the hospital records that she had delivered a baby. The jury might have been persuaded that if

the records were erroneous in one respect, they were erroneous in other respects also.

The jury was also warranted in taking into consideration the antagonistic verbal exchange between Nurse Groce and Mr. Hiatt in weighing the evidence.

The jury had before it conflicting evidence as to observable conditions of the plaintiff, such as, the contractions, their severity and the station of the child. These conditions were established by the expert testimony as indicators of the imminence of childbirth. On the basis of Mr. Hiatt's and Erma Sledd's testimony, the jury was warranted in finding the plaintiff's condition was such as to require a call to the doctor sooner than 9:15 a. m. on the day in question.

The second point asserted by the appellants is that the evidence was insufficient to support a finding that the alleged negligence of Nurse Groce was the proximate cause of plaintiff's alleged injuries.

The trial court instructed that a proximate cause of an injury is a cause which in direct, unbroken sequence produces the injury. It is one without which the injury would not have occurred. (See, *Elliott v. Chicago, Rock Island & Pac. Rld. Co.,* 203 Kan. 273, 454 P. 2d 124.)

In the case at bar, the jury was instructed that the plaintiff claimed damages by reason of "lacerations and tears" in the vicinity of her vagina and labia, and by reason of "permanent injury to the nerve fibers" of that area of the body. The court further instructed that the plaintiff might be compensated for, "Pain, suffering, disabilities, or disfigurement, and any accompanying mental anguish suffered by the plaintiff to date (and those she is reasonably certain to experience in the future)."

There was evidence that the plaintiff incurred two lacerations during this childbirth, one of which required sutures. The appellants contend, however, that no evidence was introduced from which it could reasonably have been concluded that these cuts probably would have not occurred during this childbirth had the defendant not committed the alleged acts of negligence, and had Dr. Rook been present and delivered the child himself.

Mrs. Hiatt testified concerning the pain connected with the unattended birth of her child without having had an anesthetic administered, and the traumatic experience occasioned by reason of the delivery of her child with its head and shoulders protruding, in the absence of any nurse or doctor in attendance while she was on the delivery table. She testified that Dr. Sullivan started sewing

her lacerations and that she asked him not to do it because no anesthetic had been administered to her and that it was hurting. She testified that he just kept sewing. At that time she was crying and Dr. Rook arrived and said, "Why hasn't she been given any gas?" at which time Dr. Rook turned on the gas.

The lacerations have heretofore been described. Mrs. Hiatt testified that after the suturing there was a burning and hurting sensation that persisted for some period of time.

Mrs. Hiatt testified that prior to the birth of the child here concerned, her menstrual periods were normally on a monthly basis; that her period would last three or four days; that since the birth of the child her periods have been very irregular; and that she would skip two months and then flow for two months.

Dr. Rook testified that he delivered Mrs. Hiatt's first child; that it was a normal obstetrical delivery without complications; that in that delivery he used an episiotomy, which is an incision in the lower part of the vagina, either lateral or posterior. He said the purpose of the incision is to admit delivery of the baby's head and body a little easier. Dr. Rook further testified that ordinarily an episiotomy is done *with a sedative*. He also testified that *an episiotomy is done by a trained physician or surgeon who knows where to cut.*

Mrs. Hiatt testified concerning a lack of feeling during sexual intercourse after the childbirth in question. On this subject she is qualified to testify. Her husband confirmed a lack of sexual compatibility after the childbirth in question.

Dr. Rook testified that when a lady has marital relations with her husband the friction in the vagina is transmitted to the brain through the spinal cord; that the sensation is transmitted to the spinal cord through the plexus of nerves which run to it. He said these nerves were interwoven into the mucosa of the vagina, the interior of the vagina, and there were also nerves in the labia. He testified, however, that *he could not show from a diagram which he had drawn on the board where the major nerves go.*

Dr. Rook said if a woman has no feeling in her labia and in her vagina, it does not necessarily indicate that a nerve has been damaged. He indicated that it might be caused by a psychological change; but upon further examination Dr. Rook stated that he had no reason to believe that Mrs. Hiatt had undergone a psychological change. He could think of no other reason, other than a psychological change, that would cause no feeling in the affected area.

Dr. Stubblefield admitted that if there is nerve damage there can be a disability relating to the proper performance of the sexual act. He inferred in his testimony that damage, such as was described by the plaintiff in this case, can result from nerve destruction. He stated that when there is a tear this nerve damage occurs, but that regeneration usually occurs in 60 days. He denied that such damage would result in permanent injury. Dr. Stubblefield made no physical examination of Mrs. Hiatt.

The appellants rely upon testimony of Dr. Stubblefield that there was no reasonable probability that the claimed lack of feeling during intercourse resulted from this childbirth. He testified that the act of sexual intercourse was a "complex situation" involving the brain, the "psyche", a "complex relationship between a man and woman", and the plaintiff's alleged loss of feeling could not be connected to the childbirth "with reasonable medical certainty". He also testified that lacerations may occur during childbirth regardless of whether the child is delivered by a doctor or a nurse.

It is the appellants' position that it required the expert testimony of medical witnesses to establish causal connection between the lacerations in this case and the resultant disability or defect in the sexual or reproductive organs.

The appellants argue that giving the medical testimony on the subject the most favorable interpretation, it established only a *possibility* and not a reasonable medical certainty that the negligence was the proximate cause of the loss of feeling in Mrs. Hiatt's sexual organs.

The appellee argues, assuming the jury finds loss of sexual ability in accordance with Mrs. Hiatt's testimony,

". . . [W]hether it was a numbness of the sexual organs due to loss of sensation in the transmittal of sensation from the organ to the brain, or whether it is psychological is really immaterial. There is no evidence of any kind that Appellee's testimony concerning loss of sexual ability could not or did not exist."

The two doctors did not discount Mrs. Hiatt's testimony concerning loss of sexual ability.

Mrs. Hiatt testified that after the birth of the child in question while she was in the hospital Dr. Rook attended her every day, and examined her. She said she later went to him for a six weeks checkup and "I told him how I felt. Later I called for a few ap-

pointments but I couldn't get in to see Dr. Rook, so I started going to Dr. Floersch."

The jury may have come to the conclusion that Dr. Rook was being less than candid in his testimony, when his testimony is viewed in its entirety. Dr. Rook had testified that an episiotomy is done by a trained physician or surgeon *who knows where to cut.* The doctor had previously testified that he performed an episiotomy on Mrs. Hiatt before she gave birth to her first child. Then he testified he *could not show* from a diagram which he had drawn on the board *where the major nerves go in the female sexual organs.* His subsequent refusal to see Mrs. Hiatt, after he had examined her at the six weeks checkup, could be construed by the jury as an attempt by the doctor to avoid an unfortunate situation regarding Mrs. Hiatt which he recognized.

The above testimony of Dr. Rook should be compared with the forthright candid testimony given by various physicians in *Funke v. Fieldman,* 212 Kan. 524, 512 P. 2d 539.

We have carefully reviewed the record in this case and conclude that, with the combination of lay and expert testimony, there was sufficient competent evidence of pain, suffering, disabilities, or disfigurement, and accompanying mental anguish suffered by Mrs. Hiatt to warrant the submission of the case to the jury on the issue of proximate cause.

Without objection the jury was instructed in the court's Instruction No. 14, that:

"In arriving at the amount of your verdict, you should consider plaintiff's age, condition of health before and after, and the nature, extent and duration of the injuries. For such items as pain, suffering, disability and mental anguish there is no unit value and no mathematical formula the Court can give you. You should award such sum as will fairly and adequately compensate her. The amount to be awarded rests within your sound discretion."

The appellants challenge Instructions No. 8 (heretofore quoted and approved) and No. 18 given by the trial court. These instructions must be construed with Instruction No. 11, heretofore quoted. Instruction No. 18 reads:

"You are instructed that you are to look at the evidence in this case in a common-sense light; to judge it by that experience and observation of human affairs of which you are possessed as individual members of society, and to endeavor to arrive at the truth as the evidence shows it to be."

The trial court also informed the jury that all of the instructions should be read together.

We find no error in the instructions given by the trial court when they are construed together.

The appellants contend the trial court erred in refusing to submit the special questions requested by them. It is conceded under K. S. A. 60-249 (*b*) it is within the discretion of the trial court to submit special questions to the jury upon one or more substantial questions of disputed fact on which decision is necessary to a verdict. (*Thompson v. Norman,* 198 Kan. 436, 445-446, 424 P. 2d 593.) The appellants argue that in view of the evidence as to the applicable standard of conduct and the propriety of the defendant's actions herein, together with the general instructions of the court as proposed and given to the jury, it was, and is, impossible to determine by what method and on what basis a verdict of liability was rendered.

By the special questions the appellants desired to restrict the factual conclusions of the jury to the theory and approach of the appellants, as argued and presented throughout their brief.

The trial court did not err in refusing to submit the special questions.

The appellants assert the refusal of the trial court to give requested instructions was error. These instructions are consistent with the appellants' argument that the professional physician is not expected to guarantee or insure good results, and acts properly if he uses his best judgment, so long as, in doing so, he employs that degree of learning and skill ordinarily possessed by his colleagues in the community (citing, *Natanson v. Kline,* 186 Kan. 393, 399, 350 P. 2d 1093.)

The foregoing argument fails to recognize that this is not an action against a physician for malpractice. The appellee's action is against the nurse and the hospital for *failure to procure the attendance of her physician* at the time of her need. (See, *Karrigan v. Nazareth Convent & Academy, Inc.,* supra.)

The trial court did not err in its refusal to give the appellants' requested instructions.

The judgment of the lower court is affirmed.

FONTRON, J., dissenting.

FROMME, J., not participating.