**Diane M. ROWE, Petitioner,**

v.

**Kyo Ahn KIM, M.D., Respondent.**

No. Civ.A. 00C–08–226.

Superior Court of Delaware.

Submitted Feb. 14, 2003.
Decided April 25, 2003.

---

Charles Brandt, of the Law Office of Charles Brandt, Ketchum, Idaho, and Bruce L. Hudson, of the Law Office of Bruce L. Hudson, Wilmington, Delaware, for petitioner Dianne Rowe.

Gilbert F. Shelsby, and Michael J. Logullo, of Morgan, Shelsby, & Leoni, Newark, Delaware, for respondent Kyo Ahn Kim, M.D.

## OPINION

DEL PESCO, J.

This is a claim for personal injuries filed by plaintiff, Diane M. Rowe ("Rowe") against Kyo Ahn Kim. M.D., ("Dr.Kim") a plastic and cosmetic surgeon. The plaintiff claims the she did not give informed consent to the procedure performed on her by Dr. Kim. After a three day trial, a verdict was returned in favor of Dr. Kim. Plaintiff seeks a new trial.

### Factual Background

The evidence at trial demonstrates that the chronology surrounding this litigation began two years prior to the endoscopic brow lift and laser procedure about which Rowe now complains.

In 1996, Rowe consulted Dr. Kim's office for the removal of small facial lines and wrinkles and to soften the sun damage on her face.[1] At first, Rowe sought a series

---

1. "Both sides agreed that the injuries were not the result of negligent technique and are a

of micro peels, administered by Dr. Kim's aesthetician, Regan Keenan ("Keenan"), who explained the treatments provided to plaintiff. During a micro peel, a chemical solution is applied to the entire face after the face has been scrapped with a scalpel.[2] Rowe used facial products she bought at Dr. Kim's office and had regularly scheduled maintenance facial micro peels, every four to six weeks. This continued for almost two years.[3]

The aesthetician, Keenan, testified that the micro peel treatment was not really designed to subdue the lines around the eyes. Keenan stated that throughout the course of micro peel procedures, Rowe remained concerned about visible lines and sun damage. Rowe grew increasingly dissatisfied with the results of these micro peels and was looking for a treatment that was more substantial.

To that end, Rowe and Keenan discussed a more invasive and dramatic facial peel procedure in which the skin was burned deeper; known as the "Blue Peel." The Blue Peel is a mild 15–20% trichloroacetic acid compound suspended in a blue neutralizing solution that removes more facial skin. It is designed to burn a little deeper and reach as much new skin as possible. Rowe testified that after consul-

tation with Keenan, the Blue Peel seemed to be the best course of treatment for the removal of existing fine lines and sun damage despite previous micro peels.

Rowe told the jury that after her Blue Peel, she was very disappointed. She stated that the Blue Peel did not remove the lines as anticipated. In light of the failure of the Blue Peel, Keenan recommended that Rowe see Dr. Kim in an effort to discuss a more invasive procedure, the T–C–A peel.

A T–C–A peel must be performed by a physician while the patient is under anesthesia. The T–C–A peel consists of the direct application of a 35% trichloroacetic acid solution directly to the face and neck of the patient. It produces a deep burn, down to the bottom layers of the dermis where the newest skin cells are formed. Keenan testified that the pain involved in such a burn requires the procedure to be performed while the patient is anesthetized. Rowe agreed to speak with Dr. Kim, and the appointment was scheduled.

Rowe testified that when she first consulted with Dr. Kim, she told him that she was only concerned about the fine lines around her eyes. She and Dr. Kim discussed the T–C–A peel, as well as other options for treatment.[4] She consented to

---

known and acceptable risk or complication of the type of laser surgery Dr. Kim performed on Ms. Rowe's forehead." Pl.'s Opening Br. at 1.

2. Keenan testified that:
   A micro peel is something that you—it's a several-step process. You would remove the dead skin from the surface of the face and it's just whatever is there. It's not—it's done by way of dermoplaning [sic] which is with a scalpel, you shave the face, or through using enzymes, it's a natural, it's a jelly type of substance. And that exfoliates the skin as well, and then you apply the glycolic [sic] after that. Then naturalize it, then you apply a moisturizer, then sun screen . . .

See Trial Tr. at 60:16–23; 7:1–2.

3. At trial, Rowe denied that she was concerned about sun damage or other lines on her forehead; therefore there was no reason why she would have spoken with Dr. Kim regarding treatment of these areas. Keenan contradicted this by stating that Rowe was concerned about sun damaged skin on her face. Sun damage was well documented in all of the charts and medical records kept by Dr. Kim's office.

4. Rowe testified that in years prior, both she and her twin sister had gone to a plastic surgeon at Johns Hopkins in Baltimore to treat what Rowe classified as droopy eyelids. That surgeon told Rowe that though her sis-

(i) an endoscopic brow lift,[5] (ii) a Gortex® nose implant,[6] (iii) a full face T–C–A peel, (iv) a laser procedure around the eyes, and (v) the removal of undefined body moles for biopsy. She testified that the risks of the laser were explained and she understood the risks as they related to the procedure around her eyes. She executed consent forms. The parties agree that none of the consent forms specifically mentions the use of a laser on the forehead, only around the eyes.

Rowe told the jury that immediately prior to her surgery, she decided against the nose implant, but wished to proceed with the other procedures listed on her consent forms. Between two signed consent forms, all procedures to be performed on Rowe's face that day were referenced, but not fully explained.

The gravaman of Rowe's argument is that the laser application to her forehead was not on the consent form and that at no point was her forehead discussed during any of the pre-operative office consultations with Dr. Kim. She acknowledged that the risks associated with the laser around her eyes were discussed and consented to. She also was informed regarding the far more intrusive surgery associated with the brow lift. Rowe testified that she knew that during the brow lift, Dr. Kim was going to cut muscle from her face and forehead, and that part of the procedure

included incisions across the forehead to remove skin and insert screws into her skull. The final inquiry posed by defense counsel was:

> Q: And are you telling us that if [Dr. Kim] told you he was going to do some laserring [sic] of the forehead and that it may cause some discoloration in the forehead that you were having lifted, that you wouldn't have undertaken that procedure?
>
> [Rowe]: Absolutely not.[7]

Dr. Kim told the jury that he had in fact used the laser on Rowe's forehead during the procedure. He testified that though the area around the eyes did not include the forehead, it was common to use the laser on a "feather-touch" setting to blend the skin color and texture of the new skin surface created by the brow lift with the skin surface around the eyes after the eye procedure. Dr. Kim testified that the blending procedure is always discussed with patients as it was with the plaintiff. He acknowledged that the consent form did not specifically mention lasing of the forehead.

### Analysis and Discussion

■■■ A jury verdict should not be set aside as against the great weight of the evidence unless the evidence preponderates so heavily against the verdict as to

---

ter's droopy eye problem could be cured with an eye-lift (an apparently less invasive surgical procedure) Rowe herself would require an entire brow-lift. She told the jury that this procedure had thereafter been on her to do list.

5. Dr. Kim's testimony explained the procedure of the endoscopic brow lift. After the patient is under anesthesia, the doctor makes two small incisions in each temple, inserts and endoscope and separates the facial skin from the skull bone. Next, the endoscope is used to remove the frowning muscle by cutting it out completely. The doctor next takes

the elevating muscle and pulls it up to the top of the forehead and attaches it to the skull with screws. Although unclear, at some point, portions of the.forehead are cut and removed in an effort to stretch the skin into a tighter, wrinkle free palate.

6. Dr. Kim had performed Rhinoplasty on Rowe in the past. Rowe was concerned about the slope of her nose and was considering having it adjusted again with an implant.

7. *See* Trial Tr. at 245:9–14.

make it unreasonable.[8] When reviewing a request for a new trial, the Court must evaluate all of the facts, evidence, and circumstances before the jury, and conclude that the verdict was not capricious, "unreasonable, or manifestly and palpably against the weight of the evidence." [9] In Delaware, the jury's verdict is given great deference.[10]

Simply, Rowe asserts that the standard of informed consent demands that it be in writing. Further, she argues that the great weight of the evidence at trial, including Dr. Kim's own testimony, establishes that consent for the laser procedure to petitioner's forehead was not in writing. Therefore, she concludes that the jury's verdict in favor of defendant Dr. Kim was against the great weight of the evidence.[11]

In response Dr. Kim argues that "[n]owhere in the statute or the case law is there a requirement that informed consent [ ]be in writing. If this court required that all medical procedures [ ] be in writing, then every medical procedure would be a violation of informed consent." [12]

The Health Care Medical Negligence statute contains the following provision related to informed consent:

(a) No recovery of damages based upon a lack of informed consent shall be allowed in any action for medical negligence unless:

(1) The injury alleged involved a non-emergency treatment, procedure or surgery; and

(2) The injured party proved by a preponderance of the evidence that the health care provider did not supply information regarding such treatment, procedure or surgery to the extent customarily given to patients ... by other licensed health care providers in the same or similar field of medicine as the defendant.[13]

■ The first issue is whether or not Delaware law requires written informed consent. "[I]t is well settled that statutory language is to be given its plain meaning and that when a statute is clear and unambiguous there is no need for statutory interpretation." [14] The statutory language is not ambiguous; it requires that the pa-

---

8. *See Storey v. Camper,* 401 A.2d 458, 465 (Del.1979).

9. *See Schmidt v. Hobbs,* 1988 WL 116388, *1 (Del.Supr.)(*citing McCloskey v. McKelvey,* 174 A.2d 691 (Del.Super.1961)).

10. *Young v. Frase,* 702 A.2d 1234, 1236 (Del. 1997); *see also Lawrence v. Shade,* 2002 WL 356368, *2 (Del.Super.).

11. Rowe's opening brief is replete with specific examples from the trial record, pointing to testimony in support of the proposition that Dr. Kim never actually received consent, in writing, to use the laser on her forehead. The gravaman of Rowe's complaint is that:

informed consent is a two-sided coin and both sides to that coin must be bright and shiny and clearly visible or there is no informed consent and the standard of care is violated. These two sides are: (1) an explanation of the risks of treatment, and (2)

written permission to do the treatment ... As to [side two of the coin] ... plaintiff's sole expert Dr. Henry J. Zackin and defendant's sole expert Dr. Charles Engelos Pappas agree, that the standard of care of informed consent requires permission from the patient in order for the doctor "to do a procedure." More importantly, all three doctors [apparently including Dr. Kim] agree that the standard of care requires that such permission be in writing.
*See* Pl.'s Opening Br. at 3.

12. *See* Def.'s Resp. at 7–8.

13. DEL.CODE ANN. tit. 18 § 6852 (1999).

14. *State v. Skinner,* 632 A.2d 82, 85 (Del. 1993); *see also Sostre v. Swift,* 603 A.2d 809, 813 (Del.1992), *State v. Lillard,* 531 A.2d 613 (Del.1987); *see e.g. Silverbrook Cemetery Co. v. Dept. of Finance,* 449 A.2d 241 (Del.1982).

tient receive *"information* regarding such treatment, procedure or surgery to the extent customarily given to patients." [15] The plain meaning of the language is that the extent of the *information* given must conform with the customs in the community.[16] Nowhere in the statute is there a requirement that the *information* be provided in written form.

The testimony of plaintiff's expert, Dr. Henry J. Zackin and defendant's expert Dr. Charles Engelos Pappas, that the standard of care requires that consent be given in writing is not pertinent. Standard of care relates to the delivery of medical services, the threshold of care required. Informed consent is needed to ensure that the patient voluntarily undergoes a procedure, understanding its risks. While it may be prudent for a physician to make a written record of the information provided in connection with the consent, such a record is not required by law.

Plaintiffs cite no authority for their position. The defendant cites only two cases.

The first, *Patterson v. Van Wiel,* 91 N.M. 100, 570 P.2d 931 (1977), considers a case where a pregnant woman refused an epidural anesthetic prior to labor, but during labor consented orally. The Court of Appeals of New Mexico held that consent may be oral or written. The only true requirement is that it be a "full and frank disclosure . . . of all pertinent facts relative to the [procedure]." [17]

Second, and not on point, is *Spikes v. Heath,*[18] where the Court of Appeals of Georgia discussed the disclosure requirements surrounding medical risks associated with an intrauterine contraceptive device. The Court stated that "even where the consent is technically defective or where there is no written consent . . . [consent is valid] if it can be shown that the patient knew, from any source whatever, the general course of the treatment undertaken." [19] *Spikes* is distinguishable because in Georgia, prior to 1988, failure of a physician to disclose to a patient the risks associated with a any treatment was not actionable as a matter of law.[20] Until 1988 when the Georgia legislature changed the law, all that was required by a physician in Georgia was to answer honestly any question posed by the patient.[21]

**15.** DEL.CODE ANN. tit. 18 § 6852 (1999)(*emphasis added* ).

**16.** The Delaware Supreme Court has defined the burden of proof with respect to informed consent as follows:

> The plain language of *section 6852* requires a plaintiff to produce both evidence of the standard of care (i.e., "information regarding [the relevant] treatment, procedure or surgery to the extent customarily given to patients, or other persons authorized to give consent for patients, by other licensed health care providers with similar training and/or experience in the same or similar health care communities as that of the defendant at the time of the treatment, procedure or surgery") and evidence of whether the health care provider met that standard

(i.e., the information that the health care provider actually supplied at the time of the treatment, procedure or surgery).
*Barriocanal v. Gibbs,* 697 A.2d 1169, 1172 (Del.1997).

**17.** *Patterson v. Van Wiel,* 91 N.M. 100, 570 P.2d 931, 934 (1977).

**18.** *Spikes v. Heath,* 175 Ga.App. 187, 332 S.E.2d 889 (1985) *superceded by statute* at GA.CODE ANN. tit. 31 § 31–9–6.1 (1989).

**19.** *Spikes,* 332 S.E.2d at 891.

**20.** *See Albany Urology Clinic, P.C. v. Cleveland, et al.,* 272 Ga. 296, 528 S.E.2d 777, 779 (2000).

**21.** GA.CODE ANN. tit. 31 § 31–9–6.1 (1989).

There being no basis in law or in fact for the plaintiff's motion for a new trial, it is DENIED.

IT IS SO ORDERED.