REVERSED and REMANDED for further proceedings.

Irvin L. DURFLINGER, Raymond Durflinger, and Ronald Durflinger, Plaintiffs-Appellees,

v.

Benjamin ARTILES, Preciosa Rosales, and Eduardo Medrano, Defendants-Appellants,

Kansas Psychiatric Association, Amicus Curiae.

No. 81–1744.

United States Court of Appeals, Tenth Circuit.

Jan. 27, 1984.

Deborah Carney, Turner & Boisseau, Wichita, Kan. (Christopher Randall, Turner & Boisseau, Wichita, Kan., on briefs), for plaintiffs-appellees.

Reid Stacey, Asst. Atty. Gen. of Kan., Topeka, Kan. (Robert T. Stephan, Atty. Gen. of Kan., Topeka, Kan., on briefs), for defendants-appellants.

John E. Wilkinson, Topeka, Kan., filed an amicus curiae brief on behalf of The Kan. Psychiatric Ass'n.

Before DOYLE, LOGAN and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a wrongful death action against several doctors employed by Larned State Hospital in Larned Kansas. The defendants in this action are Drs. Artiles, Rosales, and Medrano.

A detailed recitation of the facts can be found in the Kansas Supreme Court's opinion. *See Appendix, infra.* We provide a

skeletal version of the facts below. On January 7, 1974, after contemplating murdering his grandparents, Bradley Durflinger was found mentally ill by a probate judge and ordered to enter Larned State Hospital. On April 19, 1974, the defendants found that Bradley was not dangerous to himself or others and recommended his release from the hospital. On April 25, 1974, Bradley shot and killed his mother and brother.

Inasmuch as the instant action presented issues arising out of Kansas law, we submitted an interrogatory to the Supreme Court of Kansas and now have received an opinion answering the questions that were certified to the Kansas Court. That Court held as follows:

1. A claim arising out of a negligent release of a patient who has violent propensities poses a valid cause of action. Physicians have a duty to use reasonable and ordinary care and discretion in making a recommendation to release such a patient. This duty is owed to the patient and the public.

2. At least as to causes of action, such as this one, arising before enactment of the 1979 Kansas Tort Claims Act, staff doctors of a state mental institution are *not* immune from civil liability resulting from release or failure to warn of the release of a dangerous patient.

We accept these determinations by the Kansas Supreme Court. The full opinion by that court, 234 Kan. 484, 673 P.2d 86, is incorporated herein as an appendix to this opinion.

Several issues remain to be decided by this court.

## I. DEFENDANT'S CHALLENGES TO EVIDENTIARY RULINGS:

■ The defendants raise several challenges to the trial judge's decisions to admit and exclude the testimony of certain proffered witnesses. After considering the various arguments, we conclude that the trial judge acted properly in rendering his decisions. Decisions on relevance of testimony and competence of witnesses are within the broad discretion of the trial judge and will

only be reversed on a showing of abuse of discretion. *Mason v. United States,* 719 F.2d 1485, 1490 (10th Cir.1983); *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860 (10th Cir.1979). At no time did the trial court abuse its discretion.

### A. Testimony of Dr. O'Connor:

Defendants challenge the competence of plaintiffs' expert witness on the ground that he was licensed and trained in a different discipline than the defendants. The expert, Dr. William O'Connor, has several advanced degrees in clinical psychology and extensive experience in institutional procedure and mental patient evaluation. Defendants argue that notwithstanding his experience and training, Dr. O'Connor is not a medical doctor and is thus incompetent to testify on the standard of care expected of the defendant medical doctors on the team that made the challenged discharge decision. They cite Kansas law holding that a medical malpractice defendant must be evaluated according to the standards of his or her particular discipline. *Webb v. Lungstrum,* 223 Kan. 487, 575 P.2d 22 (1978); *Hiatt v. Groce,* 215 Kan. 14, 523 P.2d 320 (1974).

The trial judge considered and rejected defendants' contention. He conceded that he would "doubt that you could have a foot doctor testify as to the qualifications of a cardiologist," but held that this case involves psychological evaluation and technique common to psychiatrists and clinical psychologists.

■ We are in agreement with the trial court on this. This is not a case in which *medical* training or competence is at issue. The defendant physicians were members of a team engaged in psychological inquiry. Indeed, one of the original defendants, who settled before trial, was a clinical psychologist. All the team members agreed to discharge Bradley Durflinger, and all considered the same historical and diagnostic information. The decision involved psychological rather than medical inquiry, and a clinical psychologist such as Dr. O'Connor

has competence to testify on the proper standards applicable to such a decision. The trial judge did not abuse his discretion in admitting Dr. O'Connor's testimony.

### B. *Testimony of Dr. Dyck:*

■ The defendants also challenge the trial judge's exclusion of one of their proffered experts, a psychiatrist named Dr. Dyck. The trial judge was justified in excluding Dr. Dyck's testimony. In retaining and presenting Dr. Dyck, the defendants violated the discovery provisions of the Federal Rules of Civil Procedure. The trial court was within its discretion in excluding the testimony of the witness on these grounds.

Plaintiffs had originally retained Dr. Dyck as a consultant, and designated him as a probable witness in presenting their case. Subsequently, they decided not to use him as a witness, and so informed defendants. Plaintiffs did not give defendants any information about the substance of Dr. Dyck's evaluation because they had decided not to call him to the witness stand. Upon learning of plaintiffs' decision not to call Dr. Dyck, defendants contacted Dr. Dyck and requested a copy of the report he prepared for the plaintiffs. He sent them a copy of the evaluation and the defendants sought at trial to call him as their witness.

In proceeding in this rather unorthodox fashion, defendants violated Rule 26 of the Federal Rules of Civil Procedure. Rule 26(b)(4)(B) provides that:

> A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only .... upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

The rule is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation. *See* Advisory Committee Notes, Fed.R.Civ.P.

26(b)(4)(B); *Ager v. Jane C. Stormont Hosp. & Training School for Nurses,* 622 F.2d 496, 502 (10th Cir.1980). Under the standards articulated in *Ager, supra* at 501, Dr. Dyck was certainly an "expert who has been retained or specially employed by another party in anticipation of litigation." He prepared a report for plaintiffs after the case was filed. This was based on information furnished to him by plaintiffs. He was paid by plaintiffs for his services. In obtaining his report and assistance, defendants failed to make the necessary showing of special need to the court. Had they made a showing, there is small possibility that they could have prevailed; they had an expert testify on the same psychological principles and procedures, and could probably have obtained others with little difficulty.

In proceeding as they did, defendants circumvented the discovery process and subverted the principle of fairness that underlies Rule 26(b)(4)(B). Defendants' disregard of the Rule, coupled with the prejudice Dr. Dyck's specially informed opinion might work on plaintiffs' case, justified the trial court's exclusion of the proffered evidence. The exclusion worked no hardship on defendants because they presented another expert on the same subject. So, our holding is that the trial judge acted within his discretion. In different circumstances we recognize that a trial judge might not be required to exclude the testimony of a witness consulted in violation of the rules of discovery.

### C. *Testimony of Bradley Durflinger and Reverend Holgate:*

Defendants argue that the trial judge erred in excluding the testimony of Bradley Durflinger and Reverend Holgate. Specifically, they argue that those two witnesses would have testified to the volatile family situation and abusive history that Bradley endured while growing up. Defendants argue that this testimony is relevant to their defense of plaintiffs' contributory negligence in the deaths of Margaret and Corwin Durflinger.

■ The trial judge ruled that the defendants' theory of contributory negligence was invalid, and excluded the testimony as irrelevant. We agree. The plaintiffs in this case allege negligence in discharging a foreseeably violent mental patient. Defendants might be permitted to argue contributory negligence if the plaintiffs had contributed to the decision to discharge Bradley or if they had provoked Bradley to act violently. At the trial, however, defendants did not proceed on either of these grounds. Defendants sought to prove that plaintiffs' past abuse or neglect led or contributed to the deaths. This does not establish contributory negligence. Contributory negligence is not established unless there exists proof of past mistreatment of Bradley which proximately caused or contributed to his violence.

> Negligence is the proximate cause of an injury when it appears that "the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

*Reece Const. Co., Inc. v. State Highway Comm'n.,* 6 Kan.App.2d 188, 627 P.2d 361, 364 (1981) (quoting *Schwarzschild & Sulzberger Co. v. Weeks,* 72 Kan. 190, 83 P. 406 (1905)). Even if plaintiffs had mistreated or neglected Bradley in the past, defendants offered no evidence that the deaths of Margaret and Corwin Durflinger could reasonably be called a "natural and probable consequence" of the plaintiffs' past treatment of Bradley. Because they could not demonstrate that Bradley's alleged childhood suffering proximately caused or contributed to Bradley's violent outburst, the trial judge properly rejected their proffered theory of contributory negligence.

### D. *Deposition of Dr. Moore:*

In addition to their challenge to the trial court's rulings on witnesses, the defendants argue that the trial court improperly admitted the deposition of Dr. Federick Moore. Dr. Moore is the psychiatrist who, following the incident with Bradley's grandparents, found Bradley Durflinger to be a danger to himself and others and recommended hospitalization. The defendants contend that his deposition testimony was irrelevant and based on facts not within his personal knowledge. Neither of these arguments commands a reversal here.

■ Dr. Moore's deposition testimony was clearly relevant. He was the director of the Mental Health Institute charged by the Probate Court with evaluating Bradley Durflinger. His observations and conclusions are germane to the issue of Bradley's mental condition on admission to the hospital and his need for therapy. The defendants' relevancy objection is unfounded.

The defendants also challenge the deposition on the ground that it contains testimony based on facts not within Dr. Moore's personal knowledge. The record is not clear whether Dr. Moore was an expert witness or merely a lay witness to certain facts at issue in the case. The standards applied to lay and expert witnesses differ. Rule 602 of the Federal Rules of Evidence provides: "A [lay] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Rule 703 of the Federal Rules of Evidence permits an expert to base an opinion on any facts or data, admissible or not, which are "of a type reasonably relied on by experts in the particular field in forming opinions or inferences on the subject." *In re Aircrash in Bali, Indonesia,* 684 F.2d 1301, 1309 (9th Cir.1982) (quoting Rule 703). In drafting this rule, the Advisory Committee noted that "the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court." Advisory Committee Notes, Fed.R. Evid. 703.

■ In their brief, defendants suggest that Dr. Moore is to be treated as an expert. If this is so, then his conclusions based in part on data and reports prepared by Dr. Strange, a psychologist colleague, in reaching a conclusion on Bradley's condition and

prognosis was properly in evidence. He could and did reasonably rely on this information in forming his professional opinion. *Aircrash,* 684 F.2d at 1314 (9th Cir.1982) (expert permitted to testify on pilot competence based on flight training records).

If Dr. Moore served as a lay witness, the deposition testimony should have been limited to his conclusions based on his own observations. The conclusions based upon Dr. Strange's observations should have been excluded. This possible error in the trial judge's ruling, however, does not require reversal of this case. "Even if there is error, reversal is appropriate only if we can say that the error affected the substantial rights of the parties." *Aircrash, supra* at 1313; Fed.R.Civ.P. 61. No substantial rights were affected by this alleged error. Dr. Strange testified at trial on the same issue as Dr. Moore's deposition testimony. Moreover, the Probate Court records were already in evidence. The evidence challenged here was cumulative at worst, and did not substantially damage defendants' case.

### E. *Videotape of Bradley Durflinger:*

Defendants assert that the trial court erroneously admitted a videotape of Bradley Durflinger, which was made during his confession to the police on the day of the murders. Defendants maintain that this evidence of Bradley Durflinger's behavior subsequent to his discharge from Larned State Hospital is irrelevant and highly prejudicial.

■ The trial court received the videotape on the grounds that it was relevant to Bradley Durflinger's state of mind and demeanor and to the similarity of conduct between the contemplated murder of his grandparents and the actual murder of his mother and brother. The trial judge cautioned the jury that the tape was received and could be considered for limited purposes. The videotaped confession at issue meets the test of relevancy set forth in Federal Rule of Evidence 401. Relevant evidence within the meaning of Rule 401 is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The videotape of Bradley Durflinger, made less than a week after his discharge from Larned State Hospital meets this broad definition of relevancy. While this court may question the weight to be given to evidence of Bradley's activities subsequent to his discharge, it cannot be said that the trial court committed an abuse of discretion in finding that the evidence was relevant.

The contention of defendant that admitting this relevant evidence prejudiced the jury is a harder one. Other courts have grappled with the question of whether the admission of a videotape into evidence violated Federal Rule of Evidence 403. Rule 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

In deciding whether evidence is admissible under Rule 403, a trial judge must weigh the probative value of the challenged evidence against the probability of prejudice. *Thomas v. C.G. Tate Const. Co., Inc.,* 465 F.Supp. 566 (D.S.C.1979). Thus the decision is based on the exercise of discretion.

In *Thomas, supra,* the court excluded a proffered videotape. The videotape portrayed, in graphic detail, the pain and suffering experienced by the plaintiff as he underwent therapy for burns he received as a result of an automobile accident. The court noted that the tape would nauseate a squeamish individual. As part of its ruling, the court recognized the probable inflammatory effect the film would have on a jury, as well as the fact that the plaintiff could instead present the same evidence through the testimony of the plaintiff, his wife, doctor and therapist. In addition, the court recognized that the videotape format, without regard to its content, would stand out in the minds of jurors.

In *Grimes v. Employers Mut. Liab. Ins. Co.,* 73 F.R.D. 607 (D.Alaska, 1977), the

court allowed a portion of a videotape to be shown. The film depicted the plaintiff (the victim of an industrial accident) performing daily activities. The court ruled that the films "illustrate, better than words, the impact the injury has had on the plaintiff's life in terms of pain and suffering and loss of enjoyment of life. While the scenes are unpleasant, so is plaintiff's injury. *Id.* at 610. As noted by the *Thomas* court, liability was not at issue in *Grimes* and the film was shown only as an aid in determining damages.

The case of *Foster v. Crawford Shipping Co., Ltd.,* 496 F.2d 788 (3rd Cir.1974), is one in which plaintiff suffered personal injuries while unloading defendant's ship. The trial court found the defendant liable and the only issue on appeal was the amount of damages. After the injury, the plaintiff became a severe schizophrenic and was adjudicated an incompetent. At issue was plaintiff's prognosis for recovery. The trial court admitted a videotape of a conversation between the plaintiff and his attorney. The court of appeals held that the trial court committed reversible error in admitting the tape. Plaintiff contended that the purpose of the film was merely to illustrate their expert witnesses's testimony regarding plaintiff's condition. The court found that even if the film had actually been utilized in this way, "any benefit which might have been derived in the factfinding process by such an illustration was far outweighed by the prejudice of what amounted to ex parte testimony from the absent incompetent." *Id.* at 792.

The above cases suggest that the prejudicial effect of a videotape is decided on a case by case basis. These cases illustrate the approaches taken by various courts in deciding the admissibility of a videotape. These cases which deal with different videotapes and were decided under totally different circumstances do not, however, provide an answer for this case. The particular circumstances determine admission or exclusion. As noted above, decisions on relevancy of evidence are within the sound discretion of the trial judge. *Mason, supra.* This same rule applies to questions of preju-

dice. *Fitzgerald v. United States,* 719 F.2d 1069 (10th Cir.1983). After having reviewed the record we are unable to hold that the trial judge abused his discretion in admitting the videotape.

■ Bradley Durflinger did not appear as a raving incompetent on the videotape. The videotape suggested that Bradley was very much in control of his outward behavior. Indeed, the trial judge commented at trial: "He appears much more normal on the tube than you would imagine a guy of that character. I thought maybe the defendants wanted it for evidentiary purposes." The tape could arguably benefit either of the parties. It cannot be said to be unduly prejudicial and the trial court did not abuse its discretion in admitting it.

E.  *Remarks of Plaintiff's Attorney:*

■ The defendants also argue that the trial court erred in permitting plaintiffs' counsel to make certain remarks. According to defendants, counsel's references to famous killers and questions to witnesses regarding psychotic behavior were improper. Defendants urge this court to find that these remarks were irrelevant and prejudicial. This argument, however, is unpersuasive. The standard of review for alleged improper conduct of counsel is whether the trial court abused its discretion. *Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983); *Slade v. Slade,* 439 F.2d 130 (9th Cir.1971); *Zeigler v. Seaboard Coast Line R.R. Co.,* 437 F.2d 80 (5th Cir.1971); *Waters v. Western Company of N. Am.,* 436 F.2d 1072 (10th Cir. 1971). Moreover, "trial court discretion as to these matters is broad or—what comes to the same thing—appellate review is especially deferential." *Arnold v. Eastern Air Lines, supra* at 195. In cases containing remarks comparable to those made here, appellate courts have found that remarks of counsel were not prejudicial. *See, e.g., Zeigler, supra* at 81–82 (reference to grade crossing as a "death trap" during opening argument in tort action). Indeed, courts

have upheld as non-prejudicial comments by counsel that were much stronger than those made here. *Arnold, supra* at 196. ("[Eastern must have searched the countryside" for [opponent's expert witness] and "for 40 bucks an hour, you can probably get almost anybody to say anything"; "killing people and maiming people is something they've gotten immune to as a part of doing business.").

After considering the remarks at issue here, there is no reason to believe that the challenged comments were either prejudicial or that the trial court's response to them was an abuse of discretion. In reaching this decision it is important to note that this was a long trial. It is unlikely that these isolated remarks prejudiced the jury in any way.

## II. DEFENDANT'S CHALLENGE TO JURY INSTRUCTIONS:

Defendants contend that the trial court erred in its instructions to the jury. Essentially, defendants' argument is that the trial judge should have used the instructions proposed by appellant. The instructions given to the jury contained substantially the same information as appellants' proposed versions. While this court may note that litigants always seek the instruction that is most favorable to their position, this is not the standard by which to judge the charge to the jury. "The appellate standard of review to be applied by the court is clear: an error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Wellington v. Daniels,* 717 F.2d 932, 938 (4th Cir.1983) (citing *Connors v. McNulty,* 697 F.2d 18 (1st Cir.1983)). In addition, the reviewing court is to "consider all that the jury heard and, from standpoint of the jury, decide 'not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues.'" *Alloy Int'l. Co. v. Hoover-NSK Bearing Co.,* 635 F.2d 1222 (7th Cir.1980) (quoting *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d

1076, 1100 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)). The district court's instructions to the jury correctly stated the law governing the case and were fair to all parties. The instructions do not constitute reversible error.

## III. MOTIONS FOR DIRECTED VERDICT & NEW TRIAL:

The various points raised by the defendants have been treated in some detail and it has been this court's conclusion that none of the issues presented disclosed substantial error. Consequently, although we have noted and considered the arguments in the briefs with respect to these matters, inasmuch as the arguments involve a summary of the questions already considered, we conclude that it is unnecessary to discuss them in detail again.

The decision of the trial court, 563 F.Supp. 322, should be affirmed.

### APPENDIX

### No. 55,594

### IRVIN L. DURFLINGER,

### RAYMOND DURFLINGER, and

### RONALD DURFLINGER,

Plaintiffs,

v.

### BENJAMIN ARTILES, PRECIOSA ROSALES

### and EDUARDO MEDRANO,

Defendants.

*Syllabus by the Court*

1. Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence.

2. Negligence is an essential element of a medical malpractice action.

3. A physician is obligated to his patient to use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations.

4. The duty of a physician to exercise reasonable and ordinary care and discretion remains the same for all physicians, but what constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine with which the practitioner is involved.

5. Where a physician is employed by a state mental hospital and, as a part of such employment, participates in a hospital team recommendation to the hospital superintendent that a committed patient be discharged as being no longer in need of care or treatment, *i.e.* no longer dangerous to himself or others, said physician has a duty to use reasonable and ordinary care and discretion in making such recommendation. This duty is owed to the patient and the public.

6. Liability for negligent release of a mental patient committed to a state hospital is discussed and distinguished from liability predicated upon a therapist's failure to warn a readily identifiable potential victim of danger to him or her presented by the patient and a therapist's failure to take affirmative action to cause the commitment of a patient.

7. The superintendent of a state mental hospital is a public officer. Staff physicians employed in a state mental hospital are public employees rather than public officers.

On certification of two questions of law from the United States Court of Appeals, Tenth Circuit, WILLIAM E. DOYLE, circuit judge. Opinion filed December 2, 1983. *Question No. 1:* A claim against state mental hospital staff physicians alleging negligent release of a patient is a valid cause of action. *Question No. 2:* The staff physicians have no legal immunity from liability predicated on the negligent release of a patient in 1974.

*Deborah Carney,* of Turner and Boisseau, Chartered, of Great Bend, argued the cause, and *Christopher Randall* and *Casey R. Law,* of the same firm, were with her on the briefs for plaintiffs.

*Mary Beth Mudrick,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, and *Reid Stacey,* assistant attorney general, were with her on the briefs for defendants.

*John E. Wilkinson,* of Topeka, was on the *amicus curiae* brief for the Kansas Psychiatric Association.

*Sheila M. Janicke,* of Shawnee Mission, was on the *amicus curiae* brief for the Kansas Trial Lawyers Association.

*Mary Beth Blake,* of Fallon, Holbrook & Ellis, of Kansas City, was on the *amicus curiae* brief for the State of Kansas and State Treatment Facilities.

*John E. Shamberg, Lynn R. Johnson* and *Ruth M. Benien,* of Schnider, Shamberg & May, Chartered, of Shawnee Mission were on the *amicus curiae* brief for party-plaintiffs in complaints numbered 80–2095 and 83–2094 filed in the United States District Court for the District of Kansas.

McFARLAND, Justice:

This case comes before us on a certification from the United States Court of Appeals, Tenth Circuit, under authority of the Uniform Certification of Questions of Law Act, K.S.A.1982 Supp. 60–3201 *et seq.*

The two certified questions are:

I. WOULD THE KANSAS SUPREME COURT RECOGNIZE AS A VALID CAUSE OF ACTION A CLAIM WHICH GREW OUT OF A NEGLIGENT RELEASE OF A PATIENT WHO HAD VIOLENT PROPENSITIES, FROM A STATE INSTITUTION, AS DISTINGUISHED FROM NEGLIGENT FAILURE TO WARN PERSONS WHO MIGHT BE INJURED BY THE PATIENT AS THE RESULT OF THE RELEASE?

II. DO STAFF DOCTORS, AS DISTINGUISHED FROM THE SUPERIN-

TENDENT OR HEAD OF THE HOSPITAL OR INSTITUTION, HAVE LEGAL IMMUNITY UNDER KANSAS LAW FROM CIVIL LIABILITY RESULTING FROM A RELEASE OR FAILURE TO WARN OF THE RELEASE OF A DANGEROUS PATIENT?

The factual background giving rise to the litigation may be summarized as follows. On December 25, 1973, Butler and Carol Elliott returned to their Hutchinson, Kansas, home after a few days' absence. As they walked into their home, the Elliotts were confronted by their nineteen-year-old grandson, Bradley Durflinger, who was armed with a hatchet and a meat fork. It was Bradley's intention to kill his grandparents and steal their automobile. The planned attack was averted. The following day Butler Elliott filed a petition in the probate court of Reno County, Kansas, seeking commitment of Bradley to a mental hospital on the grounds he was, or probably would become, dangerous to himself or to the person or property of others. Bradley had a history of disciplinary problems. He had run away from home on numerous occasions. His United States Navy service had ended in discharge after he was absent without leave. In March, 1973, Bradley attempted suicide and in November, 1973, Bradley was placed on probation for shoplifting. The probate court found Bradley to be a mentally ill person and ordered he be given care or treatment at the Larned State Hospital in Larned, Kansas.

On January 8, 1974, the Elliotts delivered Bradley to the Larned State Hospital. Bradley was diagnosed by the hospital as having a passive-aggressive personality with sociopathic tendencies. On April 19, 1974, Bradley was discharged from the hospital as being no longer in need of care or treatment. On that day, the Elliotts picked Bradley up at the hospital and a few days later put him on a commercial airliner bound for Oregon in order that Bradley could reside with his parents and siblings. A week after his discharge, Bradley killed his mother (Margaret Durflinger) and his younger brother (Corwin Durflinger) by shooting each person several times with a rifle. Bradley was subsequently convicted of the two homicides and was sentenced to serve time in the Oregon penal system.

On March 25, 1975, this wrongful death action was commenced in the United States District Court for the District of Kansas. The plaintiffs are Irvin L. Durflinger (husband of Margaret and father of Corwin) and Raymond and Ronald Durflinger (sons of Margaret and brothers of Corwin). Defendants named in the action were all doctors employed at Larned State Hospital during the time of Bradley Durflinger's confinement at that institution. Liability was predicated on the alleged negligent release of Bradley from the hospital. Dr. G.W. Getz was granted summary judgment on the basis that, as superintendent of the hospital, he was a public officer acting pursuant to a special statutory duty when he approved Bradley's hospital dismissal (K.S.A.1973 Supp. 59–2924). Dr. Francisco Izaguirre (psychiatrist) was dismissed from the action on the basis of improper service. Dr. Terry Keeley (psychologist) settled with plaintiffs immediately before trial. The present defendants are Dr. Benjamin Artiles (psychiatrist and hospital clinical director), Dr. Preciosa Rosales (attending physician) and Dr. Eduardo Medrano (ward physician). Drs. Rosales and Medrano were members of the hospital team which made the recommendation to Dr. Getz to discharge Bradley. Initially the team tentatively decided Bradley should be transferred to an Oregon mental hospital. This plan would have necessitated he be flown to Oregon at the expense of the State of Kansas and be accompanied on the trip by a Larned hospital staff member. Such arrangement would be subject to the approval of the Division of Institutional Management in Topeka. Dr. Artiles, hospital clinical director, sent a note to a member of the hospital team opposing the transfer plan. Subsequently, the recommendation was made simply to discharge Bradley.

The case was tried to a jury which returned a verdict in favor of the plaintiffs in the amount of $92,300. After deducting

the Keeley settlement, judgment was entered against Drs. Artiles, Rosales and Medrano in the amount of $67,300. These three defendants then appealed to the United States Court of Appeals for the Tenth Circuit. Numerous issues have been raised in the appeal. Two questions of law have been certified by the federal appellate court to this court as being substantially determinative of the appeal and entirely subject to Kansas law. We have accepted the certification.

We turn now to the first question of law certified to this court for determination. For convenience the question is repeated.

WOULD THE KANSAS SUPREME COURT RECOGNIZE AS A VALID CAUSE OF ACTION A CLAIM WHICH GREW OUT OF A NEGLIGENT RELEASE OF A PATIENT WHO HAD VIOLENT PROPENSITIES, FROM A STATE INSTITUTION, AS DISTINGUISHED FROM NEGLIGENT FAILURE TO WARN PERSONS WHO MIGHT BE INJURED BY THE PATIENT AS THE RESULT OF THE RELEASE?

Preliminarily, some fundamental principles of the law of negligence need to be stated.

Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence. See *Marks v. St. Francis Hospital & School of Nursing,* 179 Kan. 268, 270–71, 294 P.2d 258 (1956). An accident which is not reasonable to be foreseen by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action. *Trimyer v. Norfolk Tallow Co.,* 192 Va. 776, 780, 66 S.E.2d 441 (1951); and Carrington, *Victims' Rights Litigation: A Wave of the Future?,* 11 U.Rich.L.Rev. 447, 461 (1977). In Kansas it is a fundamental rule actionable negligence must be based on a breach of duty. *Hanna v. Huer, Johns, Neel, Rivers & Webb,* 233 Kan. 206,

221, 662 P.2d 243 (1983). See also *Robertson v. City of Topeka,* 231 Kan. 358, 363, 644 P.2d 458 (1982); and *Madison v. Key Work Clothes,* 182 Kan. 186, 192, 318 P.2d 991 (1957). *Robertson v. City of Topeka,* 231 Kan. 358, 644 P.2d 458, recognized a special relationship between certain persons could give rise to a duty. Whether a duty exists is a question of law, *McIntosh v. Milano,* 168 N.J.Super. 466, 495, 403 A.2d 500 (1979); *Chesapeake & Pot. Tel. Co. v. Bullock,* 182 Va. 440, 445, 29 S.E.2d 228 (1944); *Tort Law—Duty to Warn—Psychiatrist's Duty to Warn Parties of Dangerous Patients,* 19 Duq.L.Rev. 181, 185 (1980); and Carrington, 11 U.Rich.L.Rev. at 461. Whether the duty has been breached is a question of fact. *Chesapeake & Pot. Tel. Co. v. Bullock,* 182 Va. at 445, 29 S.E.2d 228. Further, whether there is a causal connection between the breached duty and the injuries sustained is also a question of fact. *Stucky v. Johnson,* 213 Kan. 738, 739, 518 P.2d 937 (1974).

In Kansas negligence is never presumed. *Blackmore v. Auer,* 187 Kan. 434, 440, 357 P.2d 765 (1960). This court in *Blackmore* commented it may be said negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, as a result of which such other person suffers injury. 187 Kan. at 440, 357 P.2d 765. Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of which would have averted or avoided the injury. The plaintiff who sues his fellow man sues for a breach of duty owing to himself. 187 Kan. at 440, 357 P.2d 765. An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation;* it is risk to another or to others within the range of apprehension. *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), 59 A.L.R. 1253.

The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based. 187 Kan. at 441, 357 P.2d 765.

At the center of negligence is the concept of the reasonable person. What would a reasonable and prudent person, confronted by like circumstances and exercising reasonable care, have done? In other words, negligence involves acting other than as a reasonable person would do in the circumstances. The reasonable person has been observed to be the epitome of ordinariness, never reckless or absent minded, yet neither endowed with exceptional courage, foresight or skill. Mellor, The Law, p. 53 (3rd ed. 1966).

The particular area of the law of negligence with which we are concerned herein is that of medical malpractice. Negligence is an essential element of a medical malpractice action. *Natanson v. Kline,* 187 Kan. 186, 354 P.2d 670 (1960). In *Malone v. University of Kansas Medical Center,* 220 Kan. 371, 552 P.2d 885 (1976), we summarized the duties of physicians and hospitals as follows:

"In *Tefft v. Wilcox,* 6 Kan. 46, 61, this court held that a physician is obligated to his patient under the law to use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations. We have continued to impose those duties upon physicians. See PIK, Civil, 15.01 and cases there cited. A physician also has the duty to make a reasonable disclosure to the patient of pertinent facts within his knowledge relating to proposed treatment, in order that the patient may intelligently consent to or refuse the treatment. [Citation omitted.]

"Hospitals owe a duty to their patients to exercise reasonable care. This is such care, skill and diligence as the known physical and mental condition of the patient may require, and it is that degree of care used by other hospitals in the community or similar communities under like circumstances. See PIK, Civil, 15.02, and cases therein cited." 220 Kan. at 375, 552 P.2d 885.

In *Chandler v. Neosho Memorial Hospital,* 223 Kan. 1, 574 P.2d 136 (1977), this court said:

"A physician or surgeon is expected to have and to exercise that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, or similar communities; similarly, a hospital is required to exercise that degree of care, skill and diligence used by hospitals generally in the community or in similar communities under like circumstances. *Avey v. St. Francis Hospital & School of Nursing,* 201 Kan. 687, 442 P.2d 1013, and cases cited therein." 223 Kan. at 3, 574 P.2d 136.

See also PIK Civ.2d 15.01. It should be noted a physician is not a guarantor of good results and civil liability does not arise merely from bad results, nor if bad results are due to some cause other than his treatment. *Voss v. Bridwell,* 188 Kan. 643, 364 P.2d 955 (1961); *Goheen v. Graber,* 181 Kan. 107, 309 P.2d 636 (1957).

Rules of law governing the duty of physicians and surgeons to their patients apply generally to dentists (*Simpson v. Davis,* 219 Kan. 584, 549 P.2d 950 [1976] ), and to registered nurses (*Hiatt v. Groce,* 215 Kan. 14, 523 P.2d 320 [1974] ). The duty of a physician to exercise reasonable and ordinary care and diligence remains the same regardless of the particular medical specialty in which the physician practices. However, the particular decisions and acts required of the physician in fulfilling the duty will vary with the circumstances of the patient's situation and the medical specialty of the physician. Obviously such diverse medical specialties as dermatology, radiology, pediatrics, surgery, and psychiatry confront the professional practitioner of each with radically different medical problems. However, what constitutes negligence in a particular

situation is judged by the professional standards of the particular area of medicine with which the practitioner is involved.

The appellants herein are a psychiatrist and two physicians who were involved in the professional recommendation of the hospital team to discharge Bradley Durflinger on the basis he was no longer in need of care or treatment. They argue, in essence, they and others like them, should be insulated from civil liability for their acts, even if negligent, on the basis prediction of dangerousness of a mental patient is too difficult to make and, further, to hold otherwise: (1) would seriously cripple their ability to function professionally, and (2) would have a catastrophic effect on the civil rights of mentally ill persons. We do not agree.

In *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), 83 A.L.R.3d 1166, similar arguments were raised and rejected. Although *Tarasoff* involved claimed liability for failure to warn rather than for negligent release (the distinction between the two theories to be discussed later), the following rationale of the California court applies with equal force to the therapist's duty in negligent release cases:

> "The role of the psychiatrist, who is indeed a practitioner of medicine, and that of the psychologist who performs an allied function, are like that of the physician who must conform to the standards of the profession and who must often make diagnoses and predictions based upon such evaluations. Thus the judgment of the therapist in diagnosing emotional disorders and in predicting whether a patient presents a serious danger of violence is comparable to the judgment which doctors and professionals must regularly render under accepted rules of responsibility." 17 Cal.3d at 438, 131 Cal. Rptr. 14, 551 P.2d 334.

Continuing:

> "We recognize the difficulty that a therapist encounters in attempting to forecast whether a patient presents a serious danger of violence. Obviously, *we do not require that the therapist, in mak-ing that determination, render a perfect performance; the therapist need only exercise 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances.'* (*Bardessono v. Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717] *Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159–160 [41 Cal.Rptr. 577, 397 P.2d 161]; see 4 Witkin, Summary of Cal.Law (8th ed. 1974) Torts, § 514 and cases cited.) Within the broad range of reasonable practice and treatment in which professional opinion and judgment may differ, the therapist is free to exercise his or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is insufficient to establish negligence." 17 Cal.3d at 438, 131 Cal.Rptr. 14, 551 P.2d 334. (Emphasis supplied.)

Liability predicated upon negligent release of a patient committed to a mental hospital is a medical malpractice action. Bradley Durflinger was committed by the Reno County Probate Court to the Larned State Hospital upon the finding he was a mentally ill person in need of care or treatment. The statute in effect at the time of the commitment defining "mentally ill person" was K.S.A.1973 Supp. 59–2902 which provided, in pertinent part:

> "(1) The term 'mentally ill person' shall mean any person who is mentally impaired, except by reason of mental deficiency only, to the extent that he is in need of 'care or treatment' and *who is or probably will become dangerous to himself or the person or property of others* if not given 'care and treatment' and

> "(A) who lacks sufficient understanding or capacity to make responsible decisions with respect to his need for 'care or treatment', or

> "(B) who refused to seek 'care and treatment' . . . ." (Emphasis supplied.)

The petition for commitment alleged Bradley was dangerous to himself or others. The petition was filed by his grandfather

the day after Bradley had attempted to kill his grandparents. Clearly he was committed to the hospital because he was dangerous to other persons. The hospital was required to provide care or treatment for Bradley. The "head of the hospital" was required to discharge Bradley when he was "no longer in need of 'care and treatment'" (K.S.A.1973 Supp. 59–2924), i.e. no longer dangerous to himself or *others.* The three defendant-physicians were involved in the hospital team recommendation to the head of the hospital (hospital superintendent) that Bradley was no longer in need of care or treatment, *i.e.* no longer dangerous to himself or others. The making of the recommendation by the physicians to discharge or retain Bradley as a patient was a basic part of their professional employment. This professional duty obviously was for the benefit of Bradley and the public. We find no rational basis for insulating this one aspect of professional service from liability for negligence occurring in the performance thereof. The aforementioned standards for medical malpractice actions are applicable to an action for negligent release of a patient from a mental hospital. In *Davis v. Lhim,* 124 Mich.App. 291, 335 N.W.2d 481 (1983), the Michigan Court of Appeals held:

> "All psychiatrists, whether employed by a state institution or private facility, are subject to a duty to exercise competent, professional judgment in all aspects of treatment of their patients, including the decision to discharge a patient from custodial care." 124 Mich.App. at 297, 335 N.W.2d at 486.

Having reached this conclusion, we could end the discussion. However, we believe it is appropriate to distinguish negligent release from certain other types of third-party actions against physicians for damages done by their mental patients. In these other actions liability is not predicated upon the inherent duty of the physician in the ordinary course of treatment of his patient, but rather that a special relationship existed which required the physician to take some *affirmative* action outside the regular course of treatment to protect third persons. Such affirmative actions are for the benefit of third parties, not the patient, and involve such steps as notifying a potential victim, calling the police or instituting commitment proceedings.

In *Tarasoff,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, the therapist had knowledge an office patient was dangerous to a readily identifiable third person. He did not warn the third person and the patient murdered her. The California court held the therapist had an affirmative duty to warn the victim, call the police, or take other appropriate action for the victim's protection.

*Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980), involved a situation where a mental patient had been committed to a mental hospital and had been receiving psychiatric care from the Veterans Administration. The patient purchased a shotgun and resumed psychiatric *day care* treatment from the V.A. for about a month. The patient then stopped the treatment and a month later walked into a nightclub and shot Dennis Lipari to death and seriously wounded Ruth Ann Lipari. The United States was made a party to the action on the basis of negligent failure to detain the patient by seeking commitment. Here again, the duty imposed required the taking of an affirmative action for the protection of a third party, said action not being a part of the already accepted care and treatment of a committed patient such as in the case before us. In order to impose a duty to take affirmative action for the protection of third persons, the courts in both *Tarasoff* and *Lipari* adopted the Restatement (Second) of Torts § 315 (1965) and found a special relationship existed which required action be taken for the benefit of a third person.

The opinion in *Lipari* discusses in depth the *Tarasoff* decision as well as adding its own rationale. The opinion further discusses a number of policy considerations also asserted by appellants herein. The relevant portion of the *Lipari* opinion is set forth in full as follows:

"This Court must therefore determine whether Nebraska law would impose a duty on a psychotherapist to take reasonable precautions to protect potential victims of his patient, when the psychotherapist knows or should know that his patient presents a danger to others.

"Unfortunately, the Nebraska Supreme Court has never addressed the issue of a therapist's duty to third persons. It therefore becomes the duty of this Court to ascertain what rule of law the Nebraska Supreme Court would adopt in this situation. In making this determination, the Court will consider any Nebraska authority dealing with issues analogous to those raised in this case. The Court will also consider the case law of other jurisdictions, to the extent that it suggests the rule of law which the Nebraska Supreme Court would be likely to adopt. *See Hoesing v. Sears, Roebuck & Co.,* 484 F.Supp. 478, 478–79 (D.Neb.1980).

"An essential element in any negligence action is the existence of a legal duty which the defendant owes to the plaintiff. *Daniels v. Andersen,* 195 Neb. 95, 98, 237 N.W.2d 397, 400 (1975). Under the common law, a person had no duty to prevent a third party from causing physical injury to another. A number of courts, however, have recognized an exception to this general rule. Under this exception, a person has a duty to control the conduct of a third person and thereby to prevent physical harm to another if

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (1965). *See, e.g., Seibel v. City & County of Honolulu,* 61 Haw. 253, 602 P.2d 532, 536 (1979). Since there is clearly no relationship between the V.A. and the persons injured by Mr. Cribbs [patient], the Court will limit its analysis to a discussion of the relationship between Mr. Cribbs and his doctors at the V.A.

"Under the Restatement approach, the psychotherapist-patient relationship has been found to be a sufficient basis for imposing an affirmative duty on the therapist for the benefit of third persons. *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976); *McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500 (1979). Although the cases recognizing this duty are from jurisdictions other than Nebraska, this Court may be guided by these decisions since they provide a 'just and reasoned' analysis of the issues raised in the instant case. *See Seedkem v. Safranek,* 466 F.Supp. 340, 343 (D.Neb.1979). The Court will therefore discuss these decisions in some detail.

"In *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976), the plaintiffs' complaint alleged that the defendant therapists had a duty to warn their daughter of the danger posed to her by one of the therapist's patients. The California Supreme Court's analysis of whether the complaint stated a cause of action began with recognition of the general rule that one person owes no duty to control the acts of another. However, the court then adopted the Restatement's special relationship exception to this rule. Applying this exception to the facts before it, the court held that the relationship between the patient and her therapist was sufficient to support the imposition of an affirmative duty on the defendant for the benefit of third persons. *Id.* at 435, 551 P.2d at 343, 131 Cal.Rptr. at 23. This duty existed even though the defendant therapists did not stand in a special relationship to both the injured party and the person whose conduct created the risk. *Id.* at 436, 551 P.2d at 344, 131 Cal.Rptr. at 24.

"In support of recognition of this duty, the court noted that in other settings, courts had found doctors and hospitals responsible for the behavior of their patients. Among the cases cited by the *Tarasoff* court were decisions in which the courts had recognized that a mental hospital may be

liable for the negligent release of dangerous patients. *Id.* at 436 n. 7, 551 P.2d at 343 n. 7, 344, 131 Cal.Rptr. at 23 n. 7, and in which the courts had held that a doctor was liable for his negligence to those contracting a contagious disease from his patient. *Id.* at 436, 551 P.2d at 344, 131 Cal.Rptr. at 24.

"In *McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500 (1979), the New Jersey Superior Court was faced with the issue of whether a psychiatrist had a duty to warn a potential victim of one of his patients of the danger posed by that patient. The *McIntosh* court adopted the Restatement rule that a defendant has no duty to control the actions of another unless a special relationship had existed between the defendant and either the potential victim or the person whose conduct had created the risk. *Id.* at 483, 403 A.2d at 508–09. In analyzing the issue of whether the psychiatrist-patient relationship would support the creation of such a duty, the court noted that there were other factual settings in which the physician-patient relationship gave rise to an affirmative duty on the medical professions. " '[T]he concept of legal duties for the medical profession is not new. A doctor-patient relationship in some circumstances admittedly places a duty to warn others of contagious diseases. New Jersey recognizes the general rule that a person who negligently exposes another to a contagious disease, which the other contracts, is liable in damages.... Specifically, a physician has the duty to warn third persons against possible exposure to contagious diseases, *e.g.,* tuberculosis, venereal diseases, and so forth.... That duty extends to instances where the physician should have known of the infectious disease.

" 'Physicians also must report tuberculosis, venereal disease and various other contagious diseases, *see e.g.,* N.J.S.A. 26:4–15, as well as certain other conditions.' Id. at 484, 403 A.2d at 509. Based on these previously recognized duties, the *McIntosh* court concluded that the psychiatrist had an affirmative duty to take reasonable precautions to protect potential victims of his patients. In the *McIntosh* court's opinion, 'the relationship giving rise to this duty [could] be found either in that existing between the therapist and the patient, as was alluded to in *Tarasoff II,* or in the more broadly based obligation a practitioner may have to protect the welfare of the community, which is analogous to the obligation a physician has to warn third persons of infectious or contagious disease.' *Id.* at 490, 403 A.2d at 512.

"The *Tarasoff* and *McIntosh* decisions provide a well-reasoned framework for analyzing the issue of whether a psychotherapist owes an affirmative duty to persons other than his patient. This Court, however, must determine whether the Nebraska Supreme Court would adopt the *Tarasoff-McIntosh* analysis.

"The basis for the *Tarasoff-McIntosh* rule imposing an affirmative duty on psychotherapists was the courts' adoption of the special relationship analysis of the Restatement (Second) of Torts § 315. This Court is not aware of any Nebraska case expressly adopting the rule found in the Restatement § 315. However, there are two Nebraska cases which implicitly recognize the special relationship analysis. *See Daniels v. Anderson, supra,* 195 Neb. at 98, 237 N.W.2d at 400, *Rose v. Gisi,* 139 Neb. 593, 597–598, 298 N.W. 333, 336 (1941). In these cases, the Nebraska Supreme Court found a duty arising out of the defendant's relationship with the plaintiff, *Daniels v. Andersen, supra,* 195 Neb. at 98, 237 N.W.2d at 400, or with the person creating the risk, *Rose v. Gisi, supra,* 139 Neb. 597–99, 298 N.W. at 336–37. The duty required that the defendant exercise reasonable care in controlling the action of a third person. In light of these Nebraska decisions recognizing an affirmative duty based on a special relationship, this Court is of the opinion that the Nebraska Supreme Court would adopt the special relationship analysis found in Restatement § 315.

"Having determined that the special relationship rule is applicable to the instant case, the Court must next consider the issue of whether under Nebraska law the relationship between a psychotherapist and his

patient is sufficient to justify imposition of an affirmative duty on the therapist to control the conduct of his patients. Although the Nebraska Supreme Court has never addressed this issue, this Court is of the opinion that the Nebraska court would find that the therapist-patient relationship gives rise to an affirmative duty for the benefit of third persons.

"The existence of this duty is suggested by a passage from a Nebraska case involving the physician-patient privilege. In *Simonsen v. Swenson*, 104 Neb. 224, 177 N.W. 831 (1920), the court held that a doctor was not liable to his patient for disclosing the patient's confidence, when the disclosure was necessary to prevent the spread of a contagious disease. This privilege was based on the fact that '[t]he doctor's duty does not necessarily end with the patient, for on the other hand, the malady of his patient may be such that a duty may be owing to the public and, in some cases, to other particular individuals.' *Simonsen v. Swenson, supra,* 104 Neb. at 227, 177 N.W. at 832. From this passage, it may be inferred that under Nebraska law the physician-patient relationship imposes affirmative duties on the physician for the benefit of persons other than the patient. This inference is buttressed by the fact that other jurisdictions have found that a physician owes a duty to persons who may be harmed by their patient's condition. *Freese v. Lemmon,* 210 N.W.2d 576 (Iowa 1973); *Kaiser v. Suburban Transportation System,* 65 Wash.2d 461, 398 P.2d 14 (1965), *modified* [65 Wash.2d 461] 401 P.2d 350 (1965). *See Seibel v. City & County of Honolulu, supra,* 602 P.2d at 538.

"Despite this precedent imposing affirmative duties on physicians generally, the United States argues that various policy considerations counsel against the imposition of liability on psychotherapists. The primary thrust of the argument of the United States is that a therapist should not be held liable for the violent outbursts of his patients, because a therapist cannot accurately predict which patients pose a danger to other persons. To support this contention, the United States has submitted to the Court various studies which purport to prove that dangerousness cannot be predicted. The Court, however, is not persuaded that the inherent difficulties in predicting dangerousness justify denying the injured party relief regardless of the circumstances.

"The argument of the United States ignores the fact that psychiatrists and mental hospitals have been held liable for failing to predict the dangerous propensities of their patients. *See Hicks v. United States,* 511 F.2d 407, 415–17 (D.C.Cir.1975); *Eanes v. United States,* 407 F.2d 823 (4th Cir.1969); *White v. United States,* 317 F.2d 13, 17 (4th Cir.1963); *Johnson v. United States,* 409 F.Supp. 1283, 1292–94 (M.D.Fla.1976), *rev'd on other grounds* 576 F.2d 606 (5th Cir. 1978); *Greenberg v. Barbour,* 322 F.Supp. 745 (E.D.Pa.1971); *Merchants National Bank & Trust Co. v. United States,* 272 F.Supp. 409, 417–19 (D.N.D.1967); *Baker v. United States,* 226 F.Supp. 129, 132–35 (S.D.Ia.1964), *aff'd* 343 F.2d 222 (8th Cir. 1965). Moreover, the Nebraska Supreme Court has imposed on hospitals a duty to guard against their patients' dangerous mental conditions when the condition is discoverable by the exercise of reasonable care. *Foley v. Bishop Clarkson Memorial Hospital,* 185 Neb. 89, 94–95, 173 N.W.2d 881, 884–85 (1970). *See Skar v. City of Lincoln, Neb.,* 599 F.2d 253, 258 n. 5 (8th Cir.1979). These cases from Nebraska and other jurisdictions clearly show that the difficulty in predicting dangerousness has not caused the Nebraska Supreme Court or other courts to deny the existence of a cause of action for the negligence of the doctor or hospital.

"*The Court recognizes that it may be difficult for medical professionals to predict whether a particular mental patient may pose a danger to himself or others. This factor alone, however, does not justify barring recovery in all situations. The standard of care for health professionals adequately takes into account the difficult nature of the problem facing psychotherapists.*

" 'Generalizations must be avoided as much as possible in psychiatry. Negligence

cannot be imputed to the Hospital merely because of a mistake. A claim of negligence must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them. Exactitude is often impossible. The Supreme Court has recently noted " ' "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." ' *Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 100 L.Ed. 412 (1956)." *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.E.2d 103 (1975). Error and uncertainty considered alone must often be accepted without labeling them negligence.

· · · · ·

The standard to be applied, however, must take into consideration the uncertainty which accompanies psychiatric analysis. In that area, as we have suggested, negligence may not ordinarily be found short of serious error or mistake, and not necessarily when the error or mistake is serious. The concept of "due care" in appraising psychiatric problems, assuming proper procedures are followed, must take account of the difficulty often inevitable in definitive diagnosis. *Hicks v. United States, supra,* 511 F.2d at 415, 417. *See Tarasoff v. The Regents of the University of California, supra,* 17 Cal.3d at 436–37, 551 P.2d at 344–45, 131 Cal.Rptr. at 24–25; *McIntosh v. Milano,* 168 N.J.Super. at 481–83, 403 A.2d at 507–08. *Under this standard, a therapist who uses the proper psychiatric procedures is not negligent even if his diagnosis may have been incorrect. Given this protection, the Court is of the opinion that the difficulty in predicting dangerousness does not justify denying recovery in all cases.*

"A second policy argument raised by the United States involves the goal of placing mental patients in the least restrictive environment. The United States contends that imposing liability on a psychotherapist would conflict with this goal because therapists would attempt to protect themselves from liability by placing their patients in a restrictive environment. This argument misinterprets the nature of the duty imposed upon the therapist. The recognition

of this duty does not make the psychotherapist liable for any harm caused by his patient, but rather makes him liable only when his negligent treatment of the patient caused the injury in question.

'Modern psychiatry has recognized the importance of making every reasonable effort to return a patient to an active and productive life. Thus, the patient is encouraged to develop his self-confidence by adjusting to the demands of everyday existence. In this view, mental hospitals are not seen as dumping grounds for all persons whose behavior society might find inconvenient or offensive; institutionalization is the exception, not the rule, and is called for only when a paramount therapeutic interest or the protection of society leaves no choice. . . . [M]odern psychiatric practice does not require a patient to be isolated from normal human activities until every possible danger has passed. Because of the virtual impossibility of predicting dangerousness, such an approach would necessarily lead to prolonged incarceration for many patients who could become useful members of society. It has also been made clear to the Court that constant supervision and restriction will often tend to promote the very disorders they are designed to control. . . . On the other hand, despite the therapeutic benefits of this "open door" approach, the practice admittedly entails a higher potential of danger both for the patient and for those with whom he comes in contact. *In deciding the extent to which a patient should be released from restrictions, the treating physician must exercise his judgment and balance the various therapeutic considerations together with the possible dangers.* ' " *Johnson v. United States, supra,* 409 F.Supp. at 1293. *See Eanes v. United States, supra,* 407 F.2d at 824. Thus, despite the defendant's protests to the contrary, a psychotherapist is not subject to liability for placing his patient in a less restrictive environment, so long as he uses due care in assessing the risks of such a placement. This duty is no greater than the duty already owing to the patient.

"The United States' final challenge to recognition of a therapist's duty to protect third persons concerns the nature of the protection owed. The United States contends that assuming a therapist owes a duty to third persons, this duty is limited to warning potential victims of his patient's dangerous propensities. This contention is based on the holding in *Tarasoff.*

"Although the *Tarasoff* decision concerned only the issue of a therapist's duty to warn, the language of the case makes clear that the nature of the precautions which must be taken depends on the circumstances.

" 'When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

.    .    .    .    .

While the discharge of this duty of due care will necessarily vary with the facts of each case, in each instance the adequacy of the therapist's conduct must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances.' *Tarasoff v. The Regents of the University of California, supra,* 17 Cal.3d at 430–39, 551 P.2d at 340, 345, 131 Cal.Rptr. at 20–25. The Court is of the opinion that the approach suggested by this passage from *Tarasoff* is appropriate. *It is not unfair to require the psychotherapist to take those precautions which would be taken by a reasonable therapist under similar circumstances.* Moreover, this Court refuses to rule as a matter of law that a reasonable therapist would never be required to take precautions other than warnings, or that there is never a duty to attempt to detain a patient. These issues can only be determined after the parties have had an opportunity to prove what precautions a reasonable psychotherapist would take under the circumstances in issue here.

*"To summarize, this Court is of the opinion that under Nebraska law the relationship between a psychotherapist and his patient gives rise to an affirmative duty for the benefit of third persons. This duty requires that the therapist initiate whatever precautions are reasonably necessary to protect potential victims of his patient. This duty arises only when, in accordance with the standards of his profession, the therapist knows or should know that his patient's dangerous propensities present an unreasonable risk of harm to others."* 497 F.Supp. at 188–93. (Emphasis supplied.)

Although this court has never formally adopted Restatement (Second) of Torts § 315 (1965) commented on in *Lipari,* we have discussed the concept of special relationship in *Robertson v. City of Topeka,* 231 Kan. 358, 644 P.2d 458. In *Robertson* we held a police officer was not liable for the acts of an intoxicated person absent some special relationship with or specific duty owed the party injured by the intoxicated person's acts. 231 Kan. at 363. We observed a special relationship or specific duty has been found when one creates a foreseeable peril, not readily discoverable, and fails to warn. 231 Kan. at 364, 644 P.2d 458.

In actions where liability is predicated on negligent release of a patient from a mental hospital, general rules of negligence and medical malpractice control and there is no reason to apply the concept of special relationship and the resulting affirmative duty to take some special step to protect a third party or the public. We are not called upon in this case to decide whether, in Kansas, liability may be predicated upon a therapist's failure to warn a victim or failure to detain based upon a special relationship and, accordingly, decline to decide such issues in this opinion.

The answer to the first certified question is *"Yes"* based on the foregoing rationale.

We recognize as a valid cause of action, a claim which grew out of a negligent release of a patient who had violent propensities, from a state institution, as distinguished from negligent failure to warn persons who might be injured by the patient as the result of the release. In answering the question presented, we are only concerned with *whether a duty exists* in such circumstance and if so, what the duty is. We have concluded the duty exists and it is encompassed in the general duties of physicians and surgeons. Whether or not a breach of that duty occurred under the particular facts herein is outside the scope of the question of law presented to us for determination.

> The second certified question of law is: *DO STAFF DOCTORS, AS DISTINGUISHED FROM THE SUPERINTENDENT OR HEAD OF THE HOSPITAL OR INSTITUTION, HAVE LEGAL IMMUNITY UNDER KANSAS LAW, FROM CIVIL LIABILITY RESULTING FROM A RELEASE OR FAILURE TO WARN OF THE RELEASE OF A DANGEROUS PATIENT?*

As will be recalled the first certified question spoke of "negligent release of a patient" as distinguished from "negligent failure to warn." Literally in the second question we are being asked to decide the immunity issue as to both negligent release and failure to warn theories of liability. We do not believe however that such literal reading of the question is intended. There is no claim in the case before us predicated upon failure to warn. Further, the immunity issue is not dependent upon which theory liability is predicated. Finally, the certifying court (United States Court of Appeals, Tenth Circuit) has in its certification summarized its own questions as follows:

> "The principal issues are those which are set forth above, namely, whether the Kansas Supreme Court would recognize as a valid cause of action a claim for negligent release of a patient from a state hospital or institution, in the context of the facts of this case. And

secondly, whether the staff doctors, as distinguished from the hospital, have an immunity similar to that which the trial court applied to the superintendent."

We therefore will consider the question as relating solely to negligent release in the context of the facts of this case.

The cause of action herein arose before the 1979 enactment of the Kansas Tort Claims Act (K.S.A.1982 Supp. 75–6101 *et seq.*) and accordingly, any discussion of the act would be inappropriate in determining this question.

K.S.A. 46–901 (Weeks) was the governmental immunity statute in effect at the pertinent time herein (1974). The statute provided:

> "(a) It is hereby declared and provided that the following shall be immune from liability and suit on an implied contract, or for negligence or any other tort, except as is otherwise specifically provided by statute:
>
> "(1) The state of Kansas; and
>
> "(2) boards, commissions, departments, agencies, bureaus and institutions of the state of Kansas; and
>
> "(3) all committees, assemblies, groups, by whatever designation, authorized by constitution or statute to act on behalf of or for the state of Kansas.
>
> "(b) The immunities established by this section shall apply to all the members of the classes described, whether the same are in existence on the effective date of this act or become members of any such class after the effective date of this act."

In *Kern v. Miller,* 216 Kan. 724, Syl. ¶ 2, 533 P.2d 1244 (1975), K.S.A. 46–901 (Weeks) was construed as follows:

> "The immunity granted by K.S.A. 46–901 *(a)* is limited to claims against the State of Kansas and its boards, commissions, departments, agencies, bureaus and institutions; and all committees, assemblies and groups authorized to act on behalf of the state. *The words 'members of the classes described,'* appearing in subsection *(b)* of the statute, *are interpreted to mean* the *various boards, commissions, etc., which make up the classes*

*described in subsection (a), and not the individuals composing the several classes.*" (Emphasis supplied.)

The defendant-physicians herein, accordingly have no statutory immunity under K.S.A. 46–901 (Weeks).

In *Kern* the following general rule was stated:

"Public officers, when performing the duties imposed upon them by statute and exercising in good faith the judgment and discretion necessary therefor, are not liable personally in damages for injuries to private individuals resulting as a consequence of their official acts. If public officers act outside the scope of their authority they may be held liable for damages resulting from their acts." 216 Kan. 724. Syl. ¶ 3, 533 P.2d 1244.

Public employees as opposed to public officers have no such immunity. The key issue involved in this question is whether staff doctors at a state mental institution are public officers or public employees.

As stated in *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P.2d 934 (1954), a case involving failure to restrain a suicidal patient:

"It is a general principle that for negligent or tortious conduct, liability is the rule. Immunity is the exception to the rule, created by the courts which have applied it. The law's emphasis is ordinarily on liability, not immunity for wrongdoing." 175 Kan. at 762, 267 P.2d 934.

See also *Noel v. Menninger Foundation,* 180 Kan. 23, 299 P.2d 38 (1956). In *Rose v. Board of Education,* 184 Kan. 486, 337 P.2d 652 (1959), a defendant school custodian contended he was immune from liability for his negligent acts on the basis he was a public officer. In rejecting this claim, we stated:

"In principle as well as in logic, we think that sound public policy requires that a public employee be held accountable for his negligent acts to those who suffer injury by reason of his misconduct, even though he is about the business of his employer (such as here, the school board) which is immune from tort liabili-

ty under the governmental function doctrine. In other words, the official cloak of immunity should not extend to the negligent employee so as to shield him from answering for his wrongful act by which another has suffered injury." 184 Kan. at 491, 337 P.2d 652.

In *Sowers v. Wells,* 150 Kan. 630, 95 P.2d 281 (1939), this court was asked what is a "public office" and who is a "public officer"? 150 Kan. at 633, 95 P.2d 281. In response the court answered:

"While the authorities are not in complete harmony in defining the term 'public office,' or 'public officer,' it universally has been held that the right to exercise some definite portion of sovereign power constitutes an indispensable attribute of 'public office.'" 150 Kan. at 633, 95 P.2d 281.

See also *Steere v. Cupp,* 226 Kan. 566, 572, 602 P.2d 1267 (1979). Two years before *Sowers,* this court in *Miller v. Ottawa County Comm'rs,* 146 Kan. 481, 71 P.2d 875 (1937), stated:

"The distinction between an officer and an employee is that the responsibility for results is upon one and not upon the other. There is also upon an officer the power of direction, supervision and control. The distinction between a public officer and an employee is concisely made in 22 R.C.L. 379, in the following language:

"'A public office is not the same thing as a contract, and one contracting with the government is in no just and proper sense an officer of the government. The converse is likewise true and an appointment or election to a public office does not establish a contract relation between the person appointed or elected and the public.'

.     .     .     .     .

"In 53 A.L.R. 595 it is stated:

"'It may be stated, as a general rule deducible from the cases discussing the question, that a position is a public office when it is created by law, with duties cast on the incumbent which involve an

exercise of some portion of the sovereign power and in the performance of which the public is concerned, and which also are continuing in their nature and not occasional or intermittent; while a public employment, on the other hand, is a position which lacks one or more of the foregoing elements.' (See, also, 93 A.L.R. 332.)" 146 Kan. at 484–85, 71 P.2d 875. (Emphasis supplied.)

See also 63 Am.Jur.2d, Public Officers and Employees § 11, p. 634, and generally §§ 1–14; Annot., Distinction between Office and Employment, 140 A.L.R. 1076; and 35 Words and Phrases, Public Officer, pp. 408–14 (1963).

In 63 Am.Jur.2d, Public Officers and Employees § 1, at p. 625, it is commented:

"A public officer is such an officer as is required by law to be elected or appointed, who has a designation or title given him by law, and who exercises functions concerning the public, assigned to him by law. The duties of such officer do not arise out of contract or depend for their duration or extent upon the terms of a contract."

Black's Law Dictionary (5th ed. 1979), has defined public office and public official.

"*Public office.* Essential characteristics of 'public office' are (1) authority conferred by law, (2) fixed tenure of office, and (3) power to exercise some portion of sovereign functions of government; key element of such test is that 'officer' is carrying out sovereign function. *Spring v. Constantino,* 168 Conn. 563, [568,] 362 A.2d 871, 875 [(1975)]. Essential elements to establish public position as 'public office' are: position must be created by constitution, legislature, or through authority conferred by legislature, portion of sovereign power of government must be delegated to position, duties and powers must be defined, directly or impliedly, by legislature or through legislative authority, duties must be performed independently without control of superior power other than law, and position must have some permanency and continuity. *State v. Taylor,* 260 Iowa 634, [639,] 144 N.W.2d 289, 292 [(1966)]." p. 1107.

"*Public official.* The holder of a public office though not all persons in public employment are public officials because public official's position requires the exercise of some portion of the sovereign power, whether great or small. *Town of Arlington v. Bds. of Conciliation and Arbitration,* [370 Mass. 769], 352 N.E.2d 914 [(1976)]." p. 1107.

In the case before us Dr. G.W. Getz, superintendent of the Larned State Hospital was granted summary judgment by the trial court on the basis he was a public officer and hence immune from liability. The "Act for Obtaining Care and Treatment for a Mentally Ill Person" (K.S.A. 1973 Supp. 59–2901 *et seq.*) placed many duties upon Dr. Getz as the "head of the hospital." Among such duties were authority to discharge a mental patient no longer in need of care or treatment (K.S.A. 1973 Supp. 59–2924); discretionary authority to grant convalescent leave to a patient (K.S.A. 1973 Supp. 59–2924); and authority to command any peace officer or other person to take into custody a patient who was absent from the hospital without leave and to transport same back to the institution (K.S.A. 1973 Supp. 59–2926).

By contrast no similar grants of authority are given to staff physicians who were part of the unclassified service under the Kansas Civil Service Act (K.S.A. 1973 Supp. 76–12a03). K.S.A. 1973 Supp. 76–12a03 provided any physician could be removed by the Director of Mental Health & Retardation Services. Further, the Director was empowered to make all assignments and reassignments of physicians to the institutions. The staff doctors were under the control and supervision of the head of the hospital, Dr. Getz, and the Director of Mental Health & Retardation Services. (K.S.A. 1973 Supp. 76–12a06.)

In *Jagger v. Green,* 90 Kan. 153, 133 P. 174 (1913), Mr. Jagger had been discharged from his position as a field man for the Kansas City health department on the rationale he was a public officer rather than a

government employee and therefore not protected by civil service laws. Mr. Jagger brought an action in mandamus to compel the Board of Commissioners for Kansas City to recognize his position was subject to civil service. In holding for Mr. Jagger this court commented:

> "The health commissioner is the only person connected with the department of public health who holds a position analogous to an office. The field men are merely subordinate employees who work under his direction and supervision and for whose conduct he is responsible.... [T]he field men possess no other authority which rises to the dignity of corporate power officially vested. It is not important that the ordinance uses the term 'officers' in one place in speaking of the appointees in the health department. Considering the nature of the service, its relative importance, its essentially subservient character, and the placing of responsibility for results upon a superior who is given full power of direction, supervision and control, it must be held that the plaintiff was not a city officer within the meaning of the statute just referred to.

> "Since the plaintiff is not one of the appointive officers or employees excepted from the operation of the civil service act, he is entitled to claim the benefit of its provisions." 90 Kan. at 158, 133 P. 174.

In *Jones v. Botkin,* 92 Kan. 242, 139 P. 1196 (1914), a nurse-cell attendant at the state hospital for the criminally insane was fired by the warden. The warden argued Jones was a public officer serving at the warden's pleasure. This court held Jones was a public employee of the institution and accordingly, protected by the civil service act.

Although a part of the criminal code, K.S.A. 21–3110 defines "public employee" and "public officer" and, hence should be cited herein. K.S.A. 21–3110 provides in pertinent part:

> "(18) 'Public employee' is a person employed by or acting for the state or by or for a county, municipality or other subdivision or governmental instrumentality of the state for the purpose of exercising their respective powers and performing their respective duties, and who is not a 'public officer.'

> "(19) 'Public officer' includes the following, whether elected or appointed:

> "(*a*) An executive or administrative officer of the state, or a county, municipality or other subdivision or governmental instrumentality of or within the state.

> "(*b*) A member of the legislature or of a governing board of a county, municipality, or other subdivision of or within the state.

> "(*c*) A judicial officer, which shall include a judge of the district court, juror, master or any other person appointed by a judge or court to hear or determine a cause or controversy.

> "(*d*) A hearing officer, which shall include any person authorized by law or private agreement, to hear or determine a cause or controversy and who is not a judicial officer.

> "(*e*) A law enforcement officer.

> "(*f*) Any other person exercising the functions of a public officer under color of right."

Not only are these definitions in effect now but they were also in existence in April, 1974. K.S.A. 1973 Supp. 21–3110(18), (19).

Another set of statutory definitions in effect now and in 1974 is K.S.A. 75–4301 (K.S.A. 1973 Supp. 75–4301), which provides:

> "*Public office.* A position of public trust or agency, created by the Kansas constitution, by statute, by executive decree or by an ordinance or resolution of a municipal or quasi-municipal corporation passed in pursuance of legislative authority.

> "*Public officer.* Any person who holds public office in the state of Kansas, except that an attorney-at-law, acting only in his or her professional capacity, who holds no other public office shall not be construed to be a public officer for the purposes of this act, nor shall such term include any notary public or any person

who holds an office in any political party and who holds no other public office.

"*Public employee.* Any employee of the state of Kansas or any municipal or quasi-municipal corporation, except that an attorney-at-law, acting only in his or her professional capacity, who holds no other public employment shall not be construed to be a public employee for the purposes of this act."

See also K.S.A. 75–4322(*a*)–(*f*) (K.S.A. 1973 Supp. 75–4322[*a*]–[*f*]).

We conclude the staff physicians of state mental hospitals are public employees rather than public officers and hence have no common law immunity.

Next defendant-physicians argue they have statutory immunity pursuant to K.S.A. 1973 Supp. 59–2932 which provides:

"Any person acting in good faith and *without negligence shall be free from all liability,* civil or criminal, which might arise out of acting pursuant to this act. Any person who for a corrupt consideration or advantage, or through malice, shall make or join in making or advise the making of any false application, report or order provided for in this act shall be guilty of a misdemeanor, and punished by a fine of not more than one thousand dollars ($1,000) or by imprisonment in the county jail for not more than one (1) year." (Emphasis supplied)

K.S.A. 1973 Supp. 59–2932 was a part of the "Act for Obtaining Care and Treatment for a Mentally Ill Person" in effect in 1974. The statute has not been amended substantively as have so many other sections of the act.

This argument is without merit. The immunity granted by K.S.A. 1973 Supp. 59–2932 is conditioned on the person claiming same having acted in good faith and *without negligence.* Clearly the statute does not grant immunity for negligent acts and hence is no shield to a cause of action predicated upon negligence.

We conclude the answer to the second certified question is "No." Staff doctors employed in a state institution, as opposed to the hospital superintendent, have no legal immunity from civil liability resulting from an allegedly negligent release of a mental patient in 1974.